[S.F. No. 23946. July 3, 1980.]

GERALD N. VAN ATTA, JR., et al., Plaintiffs and Appellants, v. DONALD M. SCOTT, as Chief of Police, etc., et al., Defendants and Appellants.

428

**COUNSEL**

Morrison & Foerster, Girvan Peck, Kathleen V. Fisher, William Alsup, Dominic J. Campisi, McCutchen, Doyle, Brown & Enersen, John N. Hauser, Bruce G. Vanyo and Donn P. Pickett for Plaintiffs and Appellants.

Linus Masouredis, Feldman, Waldman & Kline, Mark N. Aaronson, Herbert M. Rosenthal, Margaret G. Wilkinson, Zona Sage and Sheldon Partman, Public Defender (Santa Clara), as Amici Curiae on behalf of Plaintiffs and Appellants.

George Agnost, City Attorney, and Philip S. Ward, Deputy City Attorney, for Defendants and Appellants.

Frank E. Farella, M. Laurence Popofsky, Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, John K. Van de Kamp, District Attorney (Los Angeles), Harry B. Sondheim, Roderick W. Leonard, Deputy District Attorneys, Max Thelen, Jr., Robert G. Sproul, Jr., Marc Johnston, James P. Wiezel, Thelen, Marrin, Johnson & Bridges, Walter L. Wagner, Keith C. Sorenson, District Attorney (San Mateo), William W. Larsen, Chief Deputy District Attorney, and Paul F. Wendler, Deputy District Attorney, as Amici Curiae on behalf of Defendants and Appellants.

## OPINION

**BIRD, C. J.**—This court must decide the narrow issue as to whether the trial court was correct when it held that the pretrial release and detention system employed by the City and County of San Francisco violates the due process clauses of the state and federal Constitutions.

### I

When an individual is arrested in San Francisco three methods of pretrial release are available: (1) citation (Pen. Code, §§ 853.5, 853.6); (2) bail (Pen. Code, § 1268 et seq.); or (3) own recognizance release (Pen. Code, § 1318 et seq.).[1]

Release by citation is limited by police regulations to misdemeanor offenses where the arrestee has no outstanding warrants and resides in, or within 30 miles of, San Francisco. According to those regulations, a citation should not be issued, even to one charged with a misdemeanor, if (1) the identity of the arrestee is not ascertainable; (2) the arrestee requires medical examination or care that would not be provided if he

---

[1]The California Legislature recently enacted a 10 percent deposit bail reform measure effective on January 1, 1981. (Stats. 1979, ch. 873 [No. 7 West's Cal. Legis. Service, p. 3363 (No. 5 Deering's Adv. Legis. Service, p. 626.)].) The eventual availability of this additional form of release does not materially affect this court's analysis. During its limited period of operation, the statute will provide no direct relief for felony detainees. Although felony detainees may experience minor benefits to the extent that the resources of the San Francisco Bail Project (hereafter, the OR project) are no longer employed interviewing misdemeanor detainees, this relief should be minimal since the OR project already concentrates its limited resources on interviewing felony detainees. (For a discussion of the OR project's operation, see *infra*, p. 432.)

were merely cited; (3) there is reasonable cause to believe the misdemeanor violation will continue; (4) there is a threat of danger or resistance to the public or law enforcement personnel; or (5) prosecution of the offense or of another offense would be jeopardized. Otherwise, release by citation is wholly within the discretion of the arresting officer.

Those arrested individuals, who are booked[2] rather than cited (other than those detained for a parole or probation violation or those charged with a nonbailable offense), are allowed immediate release upon the posting of bail in the amount specified in the master bail schedule. (Pen. Code, § 1269b.) Release under the bail schedule does not entail inquiry into the detainee's family or community ties, employment history, financial condition, past record for appearance in court or any other evidence that the detainee will appear. The schedule sets forth the amount of bail in accordance with the seriousness of the offense charged. This sliding scale based on seriousness is used despite the fact that the evidence introduced below indicated that persons accused of misdemeanors are more likely to fail to appear at subsequent proceedings than are felony defendants.

Anyone who is not released on bail or citation must be arraigned without unnecessary delay and in any event within 48 hours of his arrest (not including Sundays and holidays). (Pen. Code, § 825.) Bail may be reset by the court at that time for those detainees still in custody. (See Pen. Code, §§ 815a, 823, 849.) When setting bail, the court considers the likelihood of the detainee appearing in court, the seriousness of the offense charged, and the detainee's previous criminal record. (Pen. Code, § 1275.) According to the evidence adduced below, San Francisco judges give little or no consideration to the financial resources of the detainee. The judge does not know whether the detainee will be able to meet the amount of bail that is set. As a result, the judge has no way of knowing how strong an incentive to appear is created by setting bail at a particular figure.

If an individual is not released on citation or does not post bail, he may seek release on his own recognizance. (Pen. Code, § 1318.) The great majority of detainees who follow this route simply do not have the

---

[2]"To 'book' signifies the recordation of an arrest in official police records, and the taking by the police of fingerprints and photographs of the person arrested, or any of these acts following an arrest." (Pen. Code, § 7, subd. 21.)

funds to post bail. For this reason, own recognizance release is the poor person's alternative to bail.

In seeking release on their own recognizance, detainees may be assisted by the OR project. According to the record, the OR project in San Francisco processes OR release applications in the following manner. Project staff members conduct interviews with those detainees they are able to contact in city prison. The prior record of the detainee is summarized in the project's report, and relevant information regarding the detainee's community ties is verified by the project whenever possible.[3] The police report on the incident leading to the arrest is obtained by the project from police files and is attached to the application. A point system, which gives positive points to such facts as residence, family or employment in the Bay Area, is used to evaluate the detainee's likelihood of appearing for future court proceedings. The highest possible score is 12 positive points. Prior convictions contribute negative points, and persons with less than five points are automatically excluded from further consideration by the OR project. If an applicant scores five or more points, his case is presented to the court by staff members of the project.[4]

The trial court found that in San Francisco, when applications are presented to the court, the presumption is against OR release and the detainee bears the burden of showing that his application is meritorious. Further, such release is granted or denied as a matter of grace and is totally within the unfettered discretion of the trial judge. (Pen. Code, § 1318.2.) Evidence was introduced which indicated that judges apply widely different criteria in deciding whether to grant OR release, with the result that virtually identical applications are disposed of differently. Overall, only 17 percent of those individuals arrested and interviewed by the OR project were released on their own recognizance. It was found that the hearings with respect to OR release are brief and informal. Judges generally make their decision without providing written findings or even stating on the record their reasons for denying release.

---

[3]Verification entails confirming, generally by telephone conversations with two or three references supplied by the detainee, the information that he has given to the project.

[4]Applications may be presented to the court at a formal hearing or upon an ex parte motion in chambers. Throughout this opinion, the discussion of procedures at the OR hearing applies to both types of motions.

Approximately one-half of all detainees in San Francisco are unable to post bail and are not released on their own recognizance. As a direct result, they remain in jail until their cases are resolved. There was unanimous agreement among the witnesses at the trial below that many of these persons could safely be released on OR or supervised OR. The defendants' own witness, professional bondsman Al Graf, testified that "the people who are being released are the affluent. The poor are staying in jail."

In a taxpayer action filed pursuant to Code of Civil Procedure section 526a, plaintiffs attacked the statutes providing for pretrial release and San Francisco's application of those statutes. The defendants, former San Francisco Chief of Police Donald M. Scott and former Sheriff Richard D. Hongisto, maintained custody of all detainees held by the City and County of San Francisco prior to trial. Defendant Hongisto admitted in his answer that the system was unconstitutional, but refused to alter the existing practices until the system was officially declared unconstitutional. Defendant Scott denied the allegations in the complaint and contended that the detention system was lawful.

Following a seven-day trial, the court held that plaintiffs had standing to sue under section 526a of the Code of Civil Procedure, that a true and genuine case or controversy existed, and that the court had jurisdiction to adjudicate the issues. Further, the court held that the challenged statutes providing for pretrial release, as employed in San Francisco, violated the due process clauses of the federal and state Constitutions in that: (1) the prosecution is not required to assume the burden of proving that bail is necessary to assure the presence of the detainee in court; and (2) the courts are not required to furnish a written statement of reasons for denial of own recognizance release. The trial court further held that the expenditure of revenues by San Francisco to implement its existing system of pretrial release and detention was illegal until and unless present practices and procedures are modified to provide the missing procedural safeguards. This appeal followed.[5]

---

[5]The plaintiffs launched a multifaceted attack on the entire pretrial release and detention system employed in San Francisco. Beyond their procedural due process claims, plaintiffs contended that the system constitutes a violation of equal protection and substantive due process, subjects detainees to cruel and unusual punishment, deprives detainees of the privilege against self-incrimination, and subjects detainees to excessive bail in violation of the applicable provisions of both the federal and state Constitutions.

The trial court found that the pretrial release system as provided in the Penal Code and as applied in practice is not unlawful in those several regards. The plaintiffs have

## II

In *People* v. *Ramirez* (1979) 25 Cal.3d 260, 269 [158 Cal.Rptr. 316, 599 P.2d 622], this court held that the extent to which procedural due process relief is available under the California Constitution depends on a careful weighing of the private and governmental interests involved.[6] The procedures that are constitutionally required are those that will, without unduly burdening the government, maximize the accuracy of the resulting decision and respect the dignity of the individual subjected to the decision-making process. (*Id.*, at pp. 268-269.) ■ More specifically, "identification of the dictates of due process generally requires consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[7] (*Id.*, at p. 269.)

---

raised the same claims on appeal. However, today's holdings on the procedural due process issues presented will undoubtedly have some impact on the other constitutional claims raised. Should implementation of the relief ordered today not eliminate the plaintiffs' perceived need to raise these other issues, plaintiffs are not precluded from reasserting them, either in a new action or under the trial court's reservation of jurisdiction to issue "further relief as necessary and appropriate." Under these circumstances, this court finds it neither necessary nor appropriate at this time to address those issues or to disturb the trial court's rulings thereon.

[6]Due process analysis under the federal Constitution requires a finding of a protected liberty or property interest before any discussion of procedures can be reached. (*Morrissey* v. *Brewer* (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 494, 92 S.Ct. 2593].) In interpreting the federal clause, the United States Supreme Court has held that a prisoner may derive a due process liberty interest from either the state or federal Constitution or certain types of state statutes. (*Meachum* v. *Fano* (1976) 427 U.S. 215, 226 [49 L.Ed.2d 451, 460, 96 S.Ct. 2532].) In the present case, the detainee is concerned with his freedom, a liberty interest explicitly protected by the federal Constitution. Accordingly, our analysis of the plaintiffs' due process claims under the California Constitution also applies to their claims under the federal Constitution.

[7]The dissent applies the *Ramirez* framework of analysis to evaluate the substantive sufficiency of the statutory provisions authorizing pretrial release. (Dis. opn., *post*, pp. 435-436.) Such use is a misapplication of *Ramirez,* a *procedural* due process case, and evidences a fundamental misunderstanding of the issue addressed by this court. This court is not determining what kinds of substantive pretrial release procedures should be available. Rather, this court is reviewing the constitutional sufficiency of the procedures used to administer the existing statutory scheme.

The testimony in the record, which is corroborated by numerous courts and commentators from this and other jurisdictions, indicates that the private interests affected by the decision as to whether an individual will be released prior to trial are great. That decision affects the detainee's liberty, a fundamental interest second only to life itself in terms of constitutional importance. (*People* v. *Saffell* (1979) 25 Cal.3d 223, 228 [157 Cal.Rptr. 897, 599 P.2d 92]; *People* v. *Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375].) A detainee who is denied pretrial release remains in jail, often for periods of several months, despite the fact that there has been no determination of his guilt or innocence. Confined in a 12-man "gang cell" measuring 23 feet, 7 inches by 8 feet, 4 inches,[8] he is furnished jail food which consists of a sandwich or a soft substance that can be eaten with a spoon. He sleeps on a bunk without pillows or sheets. He is allowed no visitors or contact with the outside world except for court-related appearances and conversations by telephone through a glass partition. Exercise is limited to a one-hour period two or three times a week. In short, a denial of pretrial release inflicts a direct "grievous loss" upon the detainee. (Cf. *Morrissey* v. *Brewer, supra,* 408 U.S. at p. 481 [33 L.Ed.2d at p. 494].)

There are other important deprivations which follow pretrial incarceration. The detainee's ability to adequately prepare a defense is greatly curtailed[9] and consultation with an attorney is severely impaired.[10] The only place an attorney can speak with his client is in the jail

---

[8]This provides less than 17 square feet of space per inmate. This is substantially less than the minimum amount of space per inmate considered necessary by courts and prison authorities for the psychological well-being of the detainee. (*Campbell* v. *McGruder* (D.C. Cir. 1978) 580 F.2d 521, 536, fn. 28 [188 U.S.App.D.C. 258]; *Battle* v. *Anderson* (10th Cir. 1977) 564 F.2d 388, 395.)

[9]This conclusion has been corroborated by numerous courts and commentators. (E.g., *Stack* v. *Boyle* (1951) 342 U.S. 1, 8 [96 L.Ed. 3, 8, 72 S.Ct. 1]; *Smith* v. *Hooey* (1969) 393 U.S. 374, 379-380 [21 L.Ed.2d 607, 612, 89 S.Ct. 575]; Cohen, *Wealth, Bail, and the Equal Protection of the Laws* (1978) 23 Vill. L.Rev. 977, 1028-1029 [hereafter Cohen]; Thaler, *Punishing the Innocent: The Need for Due Process and the Presumption of Innocence Prior to Trial* (1978) Wis. L.Rev. 441, 455-459 [hereafter Thaler]; S.F. Com. on Crime, A Report on the Crim. Ct. of S.F., Pt. II, Bail and O.R. Release (1971) p. 12 [hereafter Committee on Crime]; Hongisto & Levine, *Workable Alternatives to the Present Bail System* (1972) 47 State Bar J. 576, 578 (hereafter Hongisto]; Younger, *It's Time to Forfeit Bail* (1973) 5 Sw.U. L.Rev. 262, 265 [hereafter Younger]; Foote, *The Coming Constitutional Crisis in Bail: II* (1965) 113 U.Pa. L.Rev. 1125, 1146-1150; Comment, *Beyond the Bail System: A Proposal for Pretrial Release in California* (1969) 57 Cal. L.Rev. 1112, 1123-1124 [hereafter *Beyond the Bail System*].)

[10]See also Cohen, *supra,* at page 1028; *Beyond The Bail System, supra,* at page 1123; Comment, *Trends in Own Recognizance Release: From Manhattan to California* (1974) 5 Pacific L.J. 675, 689 [hereafter *Trends*].

itself, a place frequently located far from, and lacking the facilities at, the attorney's office. Moreover, the detainee's communications at the jail may be inhibited due to the lack of privacy and the common fear that the jail may be "bugged." (See Cohen, *supra*, at p. 1028; Hongisto, *supra*, at p. 578.)

Imprisonment severely hinders the detainee's ability to gather evidence and interview witnesses. Consequently, the effectiveness of counsel's assistance and the detainee's right to a fair trial are generally impaired. (See *Trends, supra*, at p. 689; Cohen, *supra*, at pp. 1028-1029; *Beyond the Bail System, supra*, at pp. 1123-1124; Hongisto, *supra*, at p. 578.) Further, since incarceration generally means loss of income and often employment, the detainee's ability to retain an attorney of his own choosing may be limited. (See Thaler, *supra*, at p. 452.) If the detainee is unable to hire a private attorney, he must rely on the services of often overworked court-appointed counsel.

Finally, the fact that the detainee is frequently brought to the courtroom in jail clothing, in handcuffs or otherwise in obvious custody—as opposed to entering freely with counsel and perhaps his family—often engenders subtle prejudices in the judge and jury that necessarily interfere with the detainee's right to a fair trial. (See *Trends, supra*, at p. 690; Cohen, *supra*, at p. 1029; Goldfarb, Ransom (1965) p. 42 [hereafter Goldfarb]; Wald, *Pretrial Detention and Ultimate Freedom: A Statistical Study* (1964) 39 N.Y.U. L.Rev. 631, 632.)

Pretrial detention also has important consequences for the detainee outside the courtroom. It may imperil his job, interrupt his source of income, and impair his family relationships.[11] However, the burdens associated with pretrial detention are by no means limited to the detainee and his family. The total costs of pretrial confinement constitute a drain on public funds as well. (Cf. *Morrissey* v. *Brewer, supra*, 408 U.S. at p. 477 [33 L.Ed.2d at p. 492]; see also *People* v. *Vickers* (1972) 8 Cal.3d 451, 458 [105 Cal.Rptr. 305, 503 P.2d 1313]; Lasker, *Presumption Against Incarceration, supra*, 7 Hofstra L.Rev. at p. 413; Committee on Crime, *supra*, at pp. 23-25; Hongisto, *supra*, at pp. 578-579.) The most obvious costs are those of providing the detain-

---

[11]See *Gerstein* v. *Pugh* (1975) 420 U.S. 103, 114 [43 L.Ed.2d 54, 65, 95 S.Ct. 854]; *United States* v. *Marion* (1971) 404 U.S. 307, 320 [30 L.Ed.2d 468, 478, 92 S.Ct. 455]; Lasker, *Presumption Against Incarceration* (1979) 7 Hofstra L.Rev. 407, 413; Thaler, *supra*, at page 452; Comment, *Incarcerating the Innocent: Pretrial Detention in our Nation's Jails* (1972) 21 Buffalo L.Rev. 891, 901; Hongisto, *supra*, at page 578.

ee with food, shelter and clothing, as well as maintaining security in the jail. These expenditures are substantial. (Committee on Crime, *supra*, at pp. 23-24.) Moreover, when ancillary costs are considered, such as welfare payments to families of detainees who lose their income, the burden becomes even larger.

Beyond the monetary costs, pretrial detention spawns additional, more subtle social burdens. The testimony of Chief Deputy Sheriff Bangston, the person charged with the supervision of the San Francisco County jails, is instructive on this point: "The other reason, and I'm not referring to a prisoner that's in and out, or whatever, but to a person that has been in once or twice, has had very few arrests, that type is susceptible to the influence, if you keep him in jail, and his character and moral standards go by. Such as, if you take a person with one juvenile arrest and then he reaches maturity and takes a fall, is arrested and ends up in jail, quite often the influence that he suffers in jail will turn him to an extent anti-social, and anti-establishment, and anti-so-called accepted system, he will try to buck it. I can't think of anyone coming to jail for the first time, in spite of their moral strength, that will not be influenced." (Cf. *Morrissey* v. *Brewer, supra*, 408 U.S. at p. 484 [33 L.Ed.2d at p. 496]; see also, Thaler, *supra*, at p. 454; Lasker, *Presumption Against Incarceration, supra*, 7 Hofstra L.Rev. at p. 411; O'Rourke & Carter, *The Connecticut Bail Commission* (1970) 79 Yale L.J. 513; Comment, *Incarcerating the Innocent, Pretrial Detention in Our Nation's Jails, supra*, 21 Buffalo L.Rev. at pp. 903-904.)

Balanced against these substantial interests favoring pretrial release are several competing interests. The government's interest in assuring the presence of the accused at all court proceedings is a compelling one. The government also has a substantial interest in seeing that it achieves its objective of assuring the accused's presence at future proceedings at a reasonable cost.

Plaintiffs urge that the procedures employed in San Francisco do not properly strike the balance between these governmental and nongovernmental interests. Plaintiffs contend, and the trial court held, that due process requires both the burden of producing evidence and the burden of proof to be borne by the prosecution at the OR hearing. These two rulings must be evaluated separately.

The burden of producing evidence is "the obligation of a party to introduce evidence sufficient to avoid a ruling against him on the issue."

(Evid. Code, § 110.) The sole issue at the OR hearing is whether the detainee will appear for subsequent court proceedings if released OR. (See *In re Underwood* (1973) 9 Cal.3d 345, 348 [107 Cal.Rptr. 401, 508 P.2d 721].) ■ To answer this question the trial court must consider the following factors: (1) the detainee's ties to the community, including his employment or other sources of income (e.g., welfare payments), the duration and location of his residence, his family attachments, his property holdings, and any independent reasons for wanting to leave or remain in the community (e.g., parole or immigration status); (2) the detainee's record of appearance at past court hearings or of flight to avoid prosecution; (3) the severity of the sentence the detainee faces. (See *In re Podesto* (1976) 15 Cal.3d 921, 934-935 [127 Cal.Rptr. 97, 544 P.2d 1297].)[12]

■ In the present case, the trial court found that the prosecution should bear the burden of producing evidence to establish the detainee's ties to the community. However, the detainee is clearly the best source for this information and for names of individuals who could verify such information. Moreover, the detainee has a substantial incentive to cooperate in providing this information. If the burden of producing this evidence were placed on the prosecution, that incentive would disappear. The government would then have to conduct its own independent investigation, a costly and time-consuming undertaking. Since the government would not be able to gather information concerning the detainee's community ties as expeditiously as could the detainee, a dilemma would result. Either the OR hearing would have to be delayed—causing the prolonged detention of individuals entitled to release—or the hearing would proceed with the prosecution unable to sustain its burden—forcing the court to rule in favor of the release of a greater number of individuals who might fail to appear. Such a situation would serve the interests of neither the detainee who merits pretrial release nor the government. Therefore, this court is persuaded that due process does not require the prosecution to bear the burden of producing evidence of the detainee's lack of community ties. The trial court erred when it held to the contrary.

■ Different considerations govern the proper allocation of the burden of producing evidence on the detainee's record of appearance at

---

[12]To avoid possible misuse of this third factor, it should be emphasized that only where the most serious offenses are charged can the severity of sentence be considered dispositive of the OR release decision.

prior court hearings and the severity of the sentence he faces. The severity of the potential sentence can be readily determined by the court from the complaint and the applicable provisions of the Penal Code or other codes cited. The detainee's record of appearance at past court hearings can sometimes be discerned from his "rap sheet." In other cases, this information should be relatively easy and inexpensive for the prosecution to secure. Accordingly, this court concludes that the prosecution should bear the burden of producing evidence on these issues.

A separate question is presented by the proper allocation of the burden of proof. The burden of proof is "the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court." (Evid. Code, § 115.) It is a rule that tells the factfinder how to decide close cases. (See Underwood, *The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases* (1977) 86 Yale L.J. 1299 [hereafter Underwood].) The court below found that this burden has in practice been borne entirely by the detainee at the OR hearing. The operational effect of this practice is to create among trial courts a "...Pavlovian response of money bail [and hence a denial of OR release] to every uncertainty concerning the defendant." (Younger, *supra*, at p. 266; see also, Thaler, *supra*, at p. 446, fn. 28.) As a result, many detainees who could safely be released OR are nevertheless deprived of their freedom.

An individual's interest in his freedom has always been held sacrosanct. For this reason, it has been a basic tenet of "our society that it is far worse to convict an innocent man than to let a guilty man go free." (*In re Winship* (1970) 397 U.S. 358, 372 [25 L.Ed.2d 368, 380, 90 S.Ct. 1068] [conc.opn. of Harlan, J.]; *Patterson* v. *New York* (1977) 432 U.S. 197, 208 [53 L.Ed.2d 281, 291, 97 S.Ct. 2319].) Placing the burden of proof on the government is one means by which our system of justice gives voice to this precept. (See Underwood, *supra*, at p. 1307.) The United States Supreme Court has eloquently explained the reason for this allocation of the burden of proof: "In all kinds of litigation it is plain that where the burden of proof lies may be decisive of the outcome. [Citations.] There is always in litigation a margin of error, representing error in factfinding.... Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt...." (*Speiser* v. *Randall* (1958)

357 U.S. 513, 525-526 [2 L.Ed.2d 1460, 1472, 78 S.Ct. 1332]; accord *Mullaney* v. *Wilbur* (1975) 421 U.S. 684, 701 [44 L.Ed.2d 508, 520, 95 S.Ct. 1881].)

This court has expressed similar views. ▉ Thus, the prosecution has been held to bear a heavy burden of proof "in any proceeding in which the state threatens to deprive an individual of his 'good name and freedom.'" (*People v. Burnick* (1975) 14 Cal.3d 306, 324 [121 Cal.Rptr. 488, 535 P.2d 352] [mentally disordered sex offender hearing]; accord *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 229-230 [152 Cal.Rptr. 425, 590 P.2d 1] [appointment of conservator]; *People v. Thomas* (1977) 19 Cal.3d 630, 641 [139 Cal.Rptr. 594, 566 P.2d 228] [narcotics addict commitment proceeding]; *In re Arthur N.* (1976) 16 Cal.3d 226, 240-241 [127 Cal.Rptr. 641, 545 P.2d 1345] [commitment of a ward to the Youth Authority].)

The logic of those cases is applicable here. If an adverse ruling is made at the OR hearing, the detainee's loss of liberty is total.[13] He is incarcerated, frequently for a substantial period of time, in San Francisco's county jail, which has been characterized as "one of the worst detention facilities in the state." (Committee on Crime, *supra*, at p. 13.) Incarceration not only restricts the detainee's freedom but also impairs his ability to prepare a defense and disrupts his employment, family and social relationships. (*Ante*, at pp. 434-437.) As a result of an adverse ruling at the OR hearing, the detainee also suffers the stigma of a "loss of good name." (See Thaler, *supra*, at pp. 452-454.) Pretrial imprisonment is likely to be mistaken for a finding of the detainee's guilt rather than being recognized as his inability to make bail or persuade the judge that he would appear at future proceedings. At the very least, the detainee's removal from his home, job and community broadcasts the fact of his arrest.

Moreover, the threat of an unwarranted restraint on an individual's liberty is at its greatest where the decision being made is predictive in nature. (*People* v. *Burnick, supra,* 14 Cal.3d at p. 328; see also *Conser-*

---

[13]Although the length of detention may be limited, the detainees "'are nevertheless incarcerated against their will, a most basic form of personal liberty deprivation.'" (*Conservatorship of Roulet, supra,* 23 Cal.3d at p. 224; *People v. Olivas, supra,* 17 Cal.3d at pp. 244-245.) Moreover, the loss of liberty limits the individual's ability to communicate freely with counsel and witnesses. His restricted ability to prepare for trial may lead to a more permanent loss of liberty. (Cf. *Conservatorship of Roulet, supra,* 23 Cal.3d at p. 234.)

*vatorship of Roulet, supra,* 23 Cal.3d at pp. 234-235.) To deprive an individual of his freedom on the basis of speculation about his future conduct is contrary to the presumption of innocence that "lies at the foundation" of our judicial system. (See *Coffin* v. *United States* (1895) 156 U.S. 432, 453 [39 L.Ed. 481, 491, 15 S.Ct. 394].) Such decision making is also peculiarly subject to abuse and threatens to undermine the respect and confidence of the community in the uniform application of the criminal law. (See *In re Winship, supra,* 397 U.S. at p. 364 [25 L.Ed.2d at p. 375].)

There is an additional consideration involved in the case before this court. ■ A major function of the allocation of the burden of proof is to offset the effect of distortions in the fact-finding process that operate against the detainee. (*Conservatorship of Roulet, supra,* 23 Cal.3d at p. 233; see also Underwood, *supra,* at pp. 1306-1307.) There are several sources of such distortion at the OR hearing.

Distortion results from the fact that it is difficult for a detainee to marshal any tangible evidence of his community ties. His incarceration prevents him from effectively locating witnesses or gathering other evidence to establish his local contacts and personal reliability. Some courts may be reluctant to accept the detainee's oral representations if unverified by other sources. (Cf. *Wolff* v. *McDonnell* (1974) 418 U.S. 539, 583 [41 L.Ed.2d 935, at p. 966, 94 S.Ct. 2963] [conc. and dis. opn. of Marshall, J.]; Goldfarb, *supra,* at pp. 157-158.) Therefore, he may remain confined merely because he is unable to produce evidence, beyond his own word, of his community ties, rather than because such ties are lacking.

Distortion also results from deliberate "overcharging" by the district attorney, a not infrequent practice according to evidence presented at trial. Overcharging—the filing of more charges than are warranted by the facts—gives the court the false impression that the detainee will be eligible for a greater sentence than is likely to be the case. This gives an inaccurate picture to the trial court of the detainee's likelihood of fleeing the jurisdiction.

Thus, the value of placing the burden of proof upon the prosecution concerning the detainee's likelihood of appearing for future court proceedings is threefold. It helps to preserve the respect for the individual's liberty and for the presumption of innocence that lies at the foundation of our judicial system, to maintain the respect and confidence of the

community in the uniform application of the law and to systematically correct certain biases inherent in the OR decision-making process.

Moreover, placing the burden of proof on the prosecution should achieve these goals without significantly harming the government's interests. These interests are compromised only if a higher percentage of arrestees fail to make their scheduled court appearances. However, the defendants in the present case were unable to present any evidence whatsoever to establish that an increase in the number of OR releases in San Francisco would result in a significantly higher failure-to-appear rate. Indeed, all witnesses agreed that many persons were detained in San Francisco jails who could safely be released OR.[14] Several witnesses opined that even if nearly all detainees were so released, the failure-to-appear rate would not increase substantially.

The experiences in other jurisdictions, as reported by witnesses at the trial below and by commentators, substantiate these conclusions. (E.g., O'Rourke & Carter, *The Connecticut Bail Commission, supra*, 79 Yale L.J. at p. 515; Hongisto, *supra*, at pp. 635-636; Comment, *The Bail System and Equal Protection* (1969) 2 Loyola L.A. L.Rev. 71, 80-81; Note, *Pretrial Release in California: Proposed Reforms of an Unfair System* (1977) 8 Pacific L.J. 841, 853.) The courts of Oregon and of the District of Columbia operate under systems that create a presumption in favor of OR release. (Ore. Rev. Stat., § 135.245(3); 18 U.S.C. § 3146; *Wood* v. *United States* (D.C. Cir. 1968) 391 F.2d 981, 983.) As a result, a significantly higher percentage of detainees is released OR in those jurisdictions than in San Francisco.[15] The uncontradicted statistical evidence presented at trial indicates that despite the greater rate of OR release, the failure-to-appear rate for those released OR was no higher in those jurisdictions than in San Francisco and was no greater than the failure-to-appear rate for those released on money bail in those jurisdictions. (See also Note, *Pretrial Release in California: Proposed Reforms of an Unfair System, supra*, 8 Pacific L.J. at pp. 861-862; Younger, *supra*, at p. 275.)

---

[14]The professional bondsman called by the defendants testified, "we have always felt a lot of people should be OR'd and still a lot of people are laying in jail that should be released OR...."

[15]Estimates elicited at trial establish that approximately 50 percent of those persons arrested in Washington, D.C., and Portland, Oregon, are released on their own recognizance as compared to only about 10 percent in San Francisco. As a result, overall detention rates in Washington, D.C., and Portland, Oregon, are 5 percent and 6 percent respectively—substantially less than the overall detention rate in San Francisco.

The director of the San Mateo OR project testified that the administrators of that project were so pleased with its initial success, they lowered the number of points required for a release recommendation from five to four.[16] As a result, more detainees were released OR, yet the gross failure-to-appear rate remained only approximately 2 percent.[17] Similar testimony was received from the administrators of the New York and Philadelphia pretrial services agencies. Those cities achieved OR release rates significantly higher than San Francisco without any significant increase in the failure-to-appear rate. (See also Comment, *The Bail System and Equal Protection, supra*, 2 Loyola L.A. L.Rev. at p. 80.)

Several reasons exist to explain why an individual who is released without having posted bail returns faithfully to make his court appearances. First, failure to appear following OR release is a separate offense. (Pen. Code, §§ 1319.4 and 1319.6.) Second, if the individual is innocent, he has the incentive to appear in order to prove it. Even if he is not innocent, he has the incentive to appear in order to preserve his position in plea bargaining and to establish a record of reliability that may benefit him in the future (e.g., at the time of sentencing). Third, the individual realizes that if he fails to appear now and is subsequently arrested for a separate offense, he will not likely be granted OR release at that time. Finally, there are intangible factors such as the individual's sense of responsibility after having given his word.

The defendants were unable to affirmatively demonstrate in the trial court that the government's interests in seeing that arrestees make their required appearances in court would be jeopardized by placing the burden of proof on the prosecution. Further, the evidence presented at trial by the plaintiffs, including the experiences of other jurisdictions, indicates that the government's interests would not be compromised.

Finally, placing the burden of proof on the prosecution will not unduly increase the government's administrative costs. In contrast to the burden of producing evidence, the burden of proof imposes no additional costs or obligations at the OR hearing itself. The only added burden that might be associated with this additional procedural safeguard is

---

[16]The San Mateo project employed an interviewing and point-system recommendation process similar to that employed in San Francisco. (See *ante*, at p. 432.)

[17]The gross failure-to-appear rate excludes those individuals who voluntarily appear in court after missing an appearance.

the cost of locating and bringing to court any additional individuals who fail to appear for their scheduled appearances. However, since it does not appear that the failure-to-appear rate would significantly increase, the relative costs (i.e., the ratio of total costs to the number of detainees released) should remain approximately the same, if not decrease. Moreover, the increase in absolute costs that this would entail should not be great. (See Cohen, *supra*, at p. 1030.) Any additional costs created by placing the burden of proof on the prosecution should be more than off-set by the savings resulting from having to maintain fewer persons in custody. (See Hongisto, *supra*, at pp. 578-579; Younger, *supra*, at pp. 264-265; Committee on Crime, *supra*, at pp. 23-25.)

■ For the several reasons discussed above, this court has determined that the probable value of placing the burden of proof on the prosecution would be great and that the potential harm to the government's interests, including any administrative costs that the procedural requirement might entail, would be minimal. Accordingly, it is concluded that due process requires the burden of proof concerning the detainee's likelihood of appearing for future court proceedings to be borne by the prosecution at the OR hearing.

Finally, this court must consider whether due process requires a court to issue a written statement of reasons whenever OR release is denied. In recent years, this court as well as the United States Supreme Court has had occasion to emphasize in a wide variety of contexts that due process requires government decisions, which affect important individual interests, to be accompanied by a statement of reasons explaining the basis for such decisions. (E.g., *In re Sturm* (1974) 11 Cal.3d 258, 269-270 [113 Cal.Rptr. 361, 521 P.2d 97] [denial of parole]; *People v. Ramirez, supra*, 25 Cal.3d at p. 276 [exclusion from rehabilitation center]; *Morrissey v. Brewer, supra*, 408 U.S. at pp. 487, 489 [33 L.Ed.2d at pp. 497-499] [revocation of parole]; *Wolff v. McDonnell, supra*, 418 U.S. at p. 564 [41 L.Ed.2d at p. 955] [revocation of good-time credits]; *Kent v. United States* (1966) 383 U.S. 541, 561 [16 L.Ed.2d 84, 97, 86 S.Ct. 1045] [juvenile court's waiver of jurisdiction].)

■ This court recently explained the worthy purposes such procedures serve. "They help to assure a realistic review by providing a method of evaluating a judge's decision or order; they guard against careless decision making by encouraging the trial judge to express the grounds for his decision; and they preserve public confidence in the fair-

ness of the judicial process." (*In re John H.* (1978) 21 Cal.3d 18, 23 [145 Cal.Rptr. 357, 577 P.2d 177]; accord *In re Podesto, supra*, 15 Cal.3d at p. 937.)

These purposes are particularly pertinent in the setting of this case because it is not unusual for judges to keep a detainee in custody for punitive purposes or as a means of preventive detention. (See also Mosk, *The Purpose of Bail in the Administration of Justice, supra*, 54 Chi. Bar Record at p. 186; Goldfarb, *supra*, at pp. 46-49; Thaler, *supra*, at p. 447.) Whatever may be said as to the propriety of these considerations where a defendant seeks bail on appeal (*In re Podesto, supra*, 15 Cal.3d at p. 935), they are not proper considerations where, as at the pretrial OR hearing, the detainee has not been convicted of any crime. (*In re Underwood, supra*, 9 Cal.3d at pp. 348, 350.) Plaintiffs urge that the requirement of a written statement of reasons for a denial of OR release would reduce the incidence of these improper uses of pretrial detention.

Moreover, it is argued that requiring a written statement of reasons for the denial of OR release would ensure that a detainee's dignitary interest is recognized. Plaintiffs note that in *Ramirez, supra*, 25 Cal.3d at page 276, this court said, "'[t]he respect for individual autonomy that is at the foundation of procedural due process imposes a distinct obligation upon the government to explain fully its adverse status decision.'" Preserving the appearance of fairness is particularly important in the pretrial detention setting. As Justice Marshall said in *Wolff* v. *McDonnell, supra*, 418 U.S. at page 589 [41 L.Ed.2d at p. 970] (conc. and dis. opn.), quoting *Palmigiano* v. *Baxter* (1st Cir. 1973) 487 F.2d 1280, 1283: "'There is nothing more corrosive to the fabric of a public institution such as a prison than a feeling among those whom it contains that they are being treated unfairly.'" (Accord *Wright* v. *Enomoto* (N.D. Cal. 1976) 462 F.Supp. 397, 403, affd. (1978) 434 U.S. 1052 [55 L.Ed.2d 756, 98 S.Ct. 1223]; *Payne* v. *Superior Court* (1976) 17 Cal.3d 908, 922 [132 Cal.Rptr. 405, 553 P.2d 565].)

However, this court has not required written findings in every type of proceeding. (E.g., *In re John H., supra*, 21 Cal.3d 18 [decision to commit a juvenile to the Youth Authority]; *People* v. *Edwards* (1976) 18 Cal.3d 796 [denial of probation [135 Cal.Rptr. 411, 557 P.2d 995]].) The administrative burden created by requiring a written statement of reasons must be weighed against the nongovernmental interests. In the present case, that burden would be particularly acute.

The volume of cases affected would be far greater in the present context than in any setting where this court has previously granted the requested relief. The right to a written statement of reasons for denial of pretrial release would apply to virtually every arrestee, not just to a fraction of those found guilty. (Compare *In re Podesto, supra,* 15 Cal.3d 921; *In re Sturm, supra,* 11 Cal.3d 258.)

The increase in amount of judge time per OR hearing also militates against imposing a requirement of a written statement of reasons. A finding by the court that one specific factor is lacking is not usually sufficient to deny an application for OR release. Thus, the court would be duty bound to make written findings on a multitude of factors on each occasion where OR release is denied.

It is also significant that there are less burdensome procedures available that would at least partially safeguard the interests sought to be protected by a requirement of a written statement of reasons. Although not compulsory, an oral statement of reasons for denial of pretrial release would be beneficial. (Cf., *People* v. *Edwards, supra,* 18 Cal.3d at p. 805, fn. 12.) Moreover, an arrestee is entitled to "an automatic review of the order fixing the amount of his bail" within "five days from the time of the original order fixing the amount of his bail on the original accusatory pleading." (Pen. Code, § 1320.)[18]

█ Since the Constitution does not compel a trial judge to issue a written statement of reasons whenever OR release is denied, the trial court erred when it found to the contrary.

█ In summary, this court holds that: (1) the prosecution must bear the burden of producing evidence of the detainee's record of non-appearance at prior court hearings and of the severity of sentence the detainee faces; (2) the detainee should bear the burden of producing evidence of community ties; (3) the prosecution must bear the burden of proof concerning the detainee's likelihood of appearing at future court proceedings; and (4) the court is not constitutionally required to issue a statement of reasons when OR release is denied.[19]

---

[18]As of January 1, 1981, section 1320 will be repealed and replaced by new and different provisions. (See Stats. 1979, ch. 873, §§ 11, 13.)

[19]A decision contrary to this court's opinion was reached in *Kawaichi* v. *Madigan* (1975) 53 Cal.App.3d 461 [126 Cal.Rptr. 63]. However, that court did not provide any reasons for its decision and undertook its analysis without the benefit of our decision in

## III

One last concern remains. Is there merit to any of the following procedural questions raised on behalf of defendants: (1) do taxpayers have standing to sue under Code of Civil Procedure section 526a where other persons directly affected by the challenged system—pretrial detainees —also have standing to sue; (2) does section 526a authorize taxpayers' suits for declaratory relief; (3) is this case nonjusticiable for lack of adverse interests; and (4) is the San Francisco Superior Court bench an indispensable party whose nonjoinder deprives this court of jurisdiction?

■ Section 526a authorizes a taxpayer to file "[a]n action to... prevent[ ] any illegal expenditure of...funds...of a...city and county of the state...."[20] "The primary purpose of this statute, originally enacted in 1909, is to 'enable a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement.'" (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 267-268 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].) That section provides "a general citizen remedy for controlling illegal governmental activity." (*White* v. *Davis* (1975) 13 Cal.3d 757, 763 [120 Cal.Rptr. 94, 533 P.2d 222]; *Wirin* v. *Parker* (1957) 48 Cal. 2d 890, 894 [313 P.2d 844], citation omitted.)

■ California courts have consistently construed section 526a liberally to achieve its remedial purpose. Accordingly, the existence of individuals directly affected by the challenged governmental action— here pretrial detainees—has not been held to preclude a taxpayers' suit. Numerous decisions have affirmed a taxpayer's standing to sue despite the existence of potential plaintiffs who might also have had standing to

---

*People* v. *Ramirez, supra*, 25 Cal.3d 260. To the extent the decision in *Kawaichi* is inconsistent with this court's holding today, that decision is specifically disapproved.

[20]Section 526a states in relevant part:

"An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein."

Plaintiffs established at trial that: (1) they are residents of, and pay property taxes to, the City and County of San Francisco; (2) Police Chief Scott and Sheriff Hongisto were the officials charged with the custody of all pretrial detainees; and (3) monies raised by general property taxes are expended by the City and County of San Francisco to maintain the challenged pretrial release and detention system.

challenge the subject actions or statutes.[21] For example, in *Blair, supra,* 5 Cal.3d 258, this court permitted taxpayers to maintain an action challenging the claim and delivery statute even though aggrieved persons directly affected by its operation also had standing to sue.

Nevertheless, relying on *Gould v. People* (1976) 56 Cal.App.3d 909 [128 Cal.Rptr. 743][22] and *Di Suvero v. County of Los Angeles* (1977) 73 Cal.App.3d 718 [140 Cal.Rptr. 895],[23] defendants argue that plaintiffs cannot maintain this suit because aggrieved pretrial detainees already have standing. Such reliance is misplaced. *Gould* sought to avoid the misuse of taxpayer suits as vehicles for mounting collateral attacks on the correctness of judicial rulings in particular cases. That threat is posed by a taxpayer suit only when a person "file[s] a collateral action against a judge under the guise of a taxpayer's suit contesting the outcome of any civil or criminal action in which he believe[s] the trial court ruled erroneously." (*Gould v. People, supra,* 56 Cal.App.3d at p. 922.) Unlike the plaintiffs in *Gould,* the plaintiffs in the present case have neither joined judicial officers as party defendants nor sought to upset any particular judge's decision denying bail or OR release. Moreover, the plaintiffs in the present case do not have another existing forum in which to challenge the pretrial detention system.

---

[21]See, for example, *White v. Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222] [intelligence gathering in university classrooms]; *Adams v. Department of Motor Vehicles* (1974) 11 Cal.3d 146 [113 Cal.Rptr. 145, 520 P.2d 961, 64 A.L.R.3d 803] [garagemen's lien law]; *Love v. Keays* (1971) 6 Cal.3d 339 [98 Cal.Rptr. 811, 491 P.2d 395] [sheriff's enforcement methods in unlawful detainers]; *Serrano v. Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241] [suit to challenge state financing of public schools]; *Regents of University of California v. Superior Court* (1970) 3 Cal.3d 529 [91 Cal.Rptr. 57, 476 P.2d 457] [resolution to terminate the employment of professors who were avowed communists]; *Vogel v. County of Los Angeles* (1967) 68 Cal.2d 18 [64 Cal.Rptr. 409, 434 P.2d 961] [suit to challenge loyalty oath required of public employees]; *Wirin v. Horrall* (1948) 85 Cal.App.2d 497 [193 P.2d 470] [suit to enjoin practice of illegal searches of automobiles].

[22]In *Gould, supra,* taxpayers sued county law enforcement officials and the presiding judges of the superior and municipal courts to enjoin the prosecution of obscenity cases in which those taxpayers were charged as defendants. The Court of Appeal held that section 526a did not authorize a taxpayer suit against judicial officers because, inter alia, the plaintiff taxpayers in that case already had standing as criminal defendants to challenge the alleged unconstitutionality of the statute under which they were being prosecuted. In dictum, the court seemed to suggest that the same result would follow, at least as to the judicial officers, even if plaintiffs were not themselves the defendants in the criminal action because other criminal defendants would have standing and incentive to sue.

[23]In *Di Suvero, supra,* a taxpayer sued county law enforcement officials and the presiding judges of the county's superior and municipal courts to enjoin implementation of an administrative policy of the courts concerning criminal defendants desiring to repre-

*Di Suvero* represents an unwarranted extension of *Gould*.[24] Unlike the plaintiffs in *Gould*, the *Di Suvero* taxpayer was not a defendant in any criminal action and, therefore, had no other forum in which to press his claim. More importantly, the threat of a collateral attack upon a pending action was not present in *Di Suvero*, since that taxpayer's suit did not contest the outcome of a particular case.

The holding in *Di Suvero* is contrary to the many cases in which this court has upheld a taxpayer's right to bring a suit despite the existence of directly affected potential litigants. (Cf., *ante*, fn. 24.) These decisions are not discussed in *Di Suvero* or in *Gould*, upon which *Di Suvero* relied. This court reaffirms that taxpayers may maintain an action under section 526a to challenge an illegal expenditure of funds even though persons directly affected by the expenditure also have standing to sue. To the extent that *Di Suvero* and *Gould* are inconsistent with this rule, they are hereby disapproved.

Next, it is contended that section 526a does not authorize this action for declaratory relief. Section 526a permits a taxpayer action "to obtain a judgment . . . *restraining* and *preventing* any illegal expenditure" of public funds. (Italics added.) While such language clearly encompasses a suit for injunctive relief, taxpayer suits have not been limited to actions for injunctions. Rather, in furtherance of the policy of liberally construing section 526a to foster its remedial purpose, our courts have permitted taxpayer suits for declaratory relief,[25]

---

sent themselves. The taxpayer was not himself a criminal defendant. Relying solely on the *Gould* dictum, the court held that a taxpayer could not maintain an action against either judicial or nonjudicial officers where the allegedly illegal policy could be challenged by a person directly affected by that policy.

[24]*Gould* has been criticized as an unreasonable restriction on the taxpayers' suit which "finds no support in the applicable laws." (Collins & Myers, *The Public Interest Litigant in California: Observations on Taxpayers' Actions* (1977) 10 Loyola L.A. L.Rev. 329, 339 [hereafter *The Public Interest Litigant*].) "*Gould* seems to imply that a plaintiff must pursue the nontaxpayer's action. But to do so might well result in inadequate relief and in the continuation of some illegal or wasteful governmental practice, thereby frustrating the very purpose of taxpayers' suits. For example, an injunction may be obtained in a taxpayer's action without any showing of special damage to the particular plaintiff. However, injunctive relief might be impossible to achieve in a private civil action where more stringent rules of traditional equitable relief exist." (*Id.*) The point is well illustrated by *Card* v. *Community Redevelopment Agency* (1976) 61 Cal.App.3d 570, 575 [131 Cal.Rptr. 153].

[25]See *Stanson* v. *Mott* (1976) 17 Cal.3d 206, 223 [130 Cal.Rptr. 697, 551 P.2d 1]; *Serrano* v. *Priest, supra,* 5 Cal.3d at page 618; *Regents of University of California* v. *Superior Court, supra,* 3 Cal.3d 529; *Gogerty* v. *Coachella Valley Junior College Dist.*

damages[26] and mandamus.[27] To achieve the "socially therapeutic purpose" of section 526a, "provision must be made for a broad basis of relief. Otherwise, the perpetration of public wrongs would continue almost unhampered." (*The Public Interest Litigant, supra,* 10 Loyola L.A. L.Rev. at p. 340.) Accordingly, section 526a authorizes this suit for declaratory relief.[28]

 It is further argued that the requisite adverse interests are lacking in this case. This contention is based on the assertions that (1) after the trial of this action was concluded, the chief of police was relieved of all his prior responsibility for pretrial detainees; and (2) the only defendant presently responsible for pretrial detainees in San Francisco, the sheriff, conceded prior to trial that the challenged system was unconstitutional.

The trial record and briefs filed before this court belie the alleged lack of interest. The chief of police has vigorously opposed plaintiffs' contentions.[29] As in *Blair,* "the extensive briefs in this case demonstrate...[that] [t]here is no danger...the court will be misled by the failure of the parties adequately to explore and argue the issues." (*Blair v. Pitchess, supra,* 5 Cal.3d at p. 270.)

(1962) 57 Cal.2d 727 [21 Cal.Rptr. 806, 371 P.2d 582]; see also *Mock v. City of Santa Rosa* (1899) 126 Cal. 330 [58 P. 826] (antedating § 526a); *Card v. Community Redevelopment Agency, supra,* 61 Cal.App.3d 570; *Subriar v. City of Bakersfield* (1976) 59 Cal.App.3d 175 [130 Cal.Rptr. 853]; but see *Citizens' etc. Pensions v. Bd. of Supervisors* (1949) 91 Cal.App.2d 658 [205 P.2d 761] (declaratory relief denied; remedy at law adequate).

[26]See, for example, *Stanson v. Mott, supra,* 17 Cal.3d at pages 226-227; *Mines v. Del Valle* (1927) 201 Cal. 273 [257 P. 530], disapproved on other grounds in *Stanson v. Mott, supra.*

[27]See, for example, *Adams v. Department of Motor Vehicles, supra,* 11 Cal.3d 146.

[28]Since section 526a authorizes taxpayer suits for declaratory relief, the further contention that this suit lacks justiciability because plaintiffs have not satisfied the "actual controversy" requirements of Code of Civil Procedure section 1060 must also fail. An action, such as this one, which meets the criteria of section 526a satisfies case or controversy requirements. (*Blair v. Pitchess, supra,* 5 Cal.3d at p. 269. See also *White v. Davis, supra,* 13 Cal.3d at p. 764.)

[29]At the seven-day trial, defendant Scott cross-examined plaintiffs' witnesses and called on his own behalf an assistant district attorney for the City and County of San Francisco, the executive director of the Advisory Board of Surety Agents, and a local bondsman. Contrary to the dissent's suggestion, Scott's brief in opposition to plaintiffs' petition for hearing is not his only brief before this court. The court also has before it Scott's briefs as respondent and cross-appellant in the Court of Appeal, which affirmatively challenge the propriety of the trial court's rulings in plaintiffs' favor and answer plaintiffs' claims of error on the substantive issues. In addition, respondent has filed a post-oral argument letter brief in this court addressing the substantive issues. In short,

Defendants next contend that the San Francisco Superior Court bench is an indispensable party to this action and that the failure to join it deprives this court of jurisdiction. Code of Civil Procedure section 389, revised in 1971 to bring it into conformity with rule 19, Federal Rules of Civil Procedure,[30] provides in relevant part that "a person...shall be joined as a party in the action if...(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest...."[31]

The only interests protected by section 389 are personal ones which may be prejudiced in a concrete way by a judgment rendered in the absence of joinder.[32] (See *Bank of California* v. *Superior Court* (1940) 16 Cal.2d 516 [106 P.2d 879].) For example, in *Serrano* v. *Priest, supra,* 18 Cal.3d 728, this court considered whether the interests of the Governor and the Legislature in the constitutionality of the state's school financing scheme were such as to render them indispensable parties. The court held that the interests of the Governor and the Legislature as "lawmakers concerned with the validity of statutes enacted by them...[are] not of the immediacy and directness requisite to party status...." (*Id.,* at p. 752.)

The interests of the judges charged with setting bail and deciding motions for own recognizance release are similarly remote. Judges are undoubtedly interested in any case which may affect the exercise of their discretion or the administration of justice. However, judicial inter-

---

defendant has at all times on appeal contested plaintiffs' claims and has been ably represented by the San Francisco City Attorney's office. It is also noted that the court has received amicus briefs in support of Scott's position on the substantive questions presented from the California District Attorneys' Association, the District Attorney of Los Angeles County, the Capitol City Bail Association, and the California Board of Surety Agents. (See *Jess* v. *Hermann* (1979) 26 Cal.3d 131, 136 [161 Cal.Rptr. 87, 604 P.2d 208].)

[30]Law Revision Commission comment, Code of Civil Procedure section 389; *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 753, footnote 27 [135 Cal.Rptr. 345, 557 P.2d 929].

[31]Defendants do not contend that the judges are indispensable under clauses (1) or (2)(ii) of subdivision (a) of section 389. Manifestly, complete relief can be accorded among those already parties (cl. (1)), and the failure to join judges does not subject the parties to any risk of incurring multiple obligations (cl. (2)(ii)).

[32]See Federal Rules Advisory Committee Note, cited in the California Law Revision Commission comment to Code of Civil Procedure section 389 (14 West's Code Civ. Proc. (1973 ed.) p. 223). The commission stated that the explanatory note prepared by the advisory committee "is particularly helpful in describing the nature and effect of Section 389." (*Ibid.*)

est is no greater here than in any other case which challenges the constitutionality of statutes or their practices. It does not rise to a personal stake in the outcome of the case. (Cf. *Pettit* v. *Gingerich* (D.Md. 1977) 427 F.Supp. 282, affd. 582 F.2d 869.) Here, as in *Serrano*, invocation of the doctrine of indispensability would "thwart rather than accomplish justice." (*Bank of California* v. *Superior Court, supra*, 16 Cal.2d at p. 521.)

## IV

The effect of today's decision is neither to undercut the constitutional right to bail guaranteed by the first clause of article I, section 12 of the California Constitution, nor to create a right to OR release in contravention of the second clause of that section.[33] Nevertheless, the dissent seems to argue that today's decision modifies the absolute right to bail and discretionary right to OR release mandated by article I, section 12. Nothing could be further from the truth.

This court's decision in no way alters the detainee's right to bail. Release on own recognizance and release on bail are alternative and complementary systems. If the detainee is able and chooses to post the amount of bail established by the master bail schedule (Pen. Code, § 1269b) or set by the court (Pen. Code, §§ 815a, 1320), he will be released. The additional procedures required at an OR hearing by today's decision could not possibly interfere or conflict with the detainee's right to bail.

Placing the burden of proof on the prosecution concerning the likelihood that the detainee will appear at future court proceedings is not tantamount to creating a right to OR release and is not inconsistent with retention of discretion by the trial judge. If, after weighing the facts presented at the OR hearing in accordance with the requirements of procedural due process as set forth herein, the court believes the detainee is likely not to appear for subsequent court proceedings, OR release may be denied. Today's decision merely requires, in keeping with well established precedent, that the trial court not exercise its discretion arbitrarily. (See *Ex Parte Hoge* (1874) 48 Cal. 3, 5; *In re Podesto, supra*, 15 Cal.3d at p. 933.)

---

[33] Article I, section 12 provides: "A person shall be released on bail by sufficient sureties, except for capital crimes when the facts are evident or the presumption great. Excessive bail may not be required. [¶] A person may be released on his or her own recognizance in the court's discretion."

This is not the first time this court has been required to address purported conflicts between specific constitutional provisions and more general guarantees such as the equal protection or due process clauses of the state Constitution. In *Hawkins v. Superior Court* (1978) 22 Cal.3d 584 [150 Cal.Rptr. 435, 586 P.2d 916], it was argued that a finding that denial of a post-indictment preliminary hearing deprived the accused of the equal protection of the law was barred by article I, sections 14 and 23 of the California Constitution, which explicitly sanctioned the grand jury indicting process. In rejecting this construction, this court stated: "The state constitutional provision recognizing the grand jury's indicting function—article I, section 14—is no bar to our holding herein. . . . [W]hile the Constitution authorizes the use of grand juries to indict criminal defendants, it leaves to the Legislature and the courts the task of developing procedures, consistent with other state constitutional provisions, for implementing that mode of initiating prosecutions." (*Id.*, at p. 594, fn. omitted; see also *Serrano v. Priest, supra*, 18 Cal.3d at p. 773.) Similarly, in the present case, the courts have the task of developing procedures to ensure that release by bail and release on one's own recognizance are implemented in a constitutionally proper manner.

Article I, section 12 of the state Constitution was amended in 1974 by ballot Proposition 7, following a recommendation by the California Constitution Revision Commission. The commission's comment in support of its recommendation stated, "[t]he 'Own Recognizance' system presents a desired alternative to the bail system, which frequently works an injustice on those who cannot afford to post a bail bond." (Proposed Rev. of Cal. Const., pt. 5, Cal. Const. Rev. Com. (1971) p. 19; see also, Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 5, 1974), argument in favor of Prop. 7, p. 28.) This court is merely implementing the spirit of the 1974 amendment in holding that due process requires the prosecution to bear the burden of proof as to why a detainee would not be released on his own recognizance.

## V

The judgment of the trial court is modified in two respects. The burden of producing evidence as to community ties is to be with the detainee and the requirement of a written statement by the court of the reasons for the denial of OR release is disapproved. As so modified, the judgment is affirmed. Plaintiffs are to recover their costs on appeal.

Tobriner, J., and Mosk, J., concurred.

**NEWMAN, J.**—I concur in the Chief Justice's opinion except that I would rely solely on the California Constitution.

**CLARK, J.**—I dissent.

The majority opinion reflects a fundamental misunderstanding of the judiciary's role in our tripartite system of government. While purportedly examining a trial court record for error, the majority's real search is for a platform from which to express policy views in concluding there exists a denial of due process based on evidence of its own manufacture and on trial court findings lending no support for that conclusion. From that platform the majority announce they will not abide by express constitutional and legislative policy as, apparently, they are better qualified to make those determinations.

The majority defensively assert their holding does not create a right to own recognizance (OR) release in contravention of article I, section 12 of the California Constitution.[1] (*Ante*, p. 452.) That section provides that a person "shall be released" on bail by sufficient sureties, and "may be released" on his or her OR in the court's discretion. The Constitution thus denies a "right" to OR release, although allowing discretionary *consideration* of an application for OR release. However, by imposing upon the prosecution the burden of proving facts warranting denial of a detainee's application for OR release,[2] the majority create a presumption that a detainee is now entitled to OR release. The significant right thus created is contrary to the express constitutional presumption in favor of bail and against OR release. The judiciary is not empowered to make rules contrary to the express mandate of the People.[3]

In opposing the majority's doctrine of government by judiciary, the following matters are presented: (1) the absence of a justiciable controversy; (2) the inadequacy of a record to support the majority holding

---

[1]Section 12 provides: "A person shall be released on bail by sufficient sureties, except for capital crimes when the facts are evident or the presumption great. Excessive bail may not be required. [¶] A person may be released on his or her own recognizance *in the court's discretion.*" (Italics added.)

[2]The majority hold, inter alia, that "the prosecution must bear the burden of proof concerning the detainee's likelihood of appearing at future court proceedings." (*Ante,* p. 446.)

[3]By an initiative measure the People have expressly adopted current bail and OR release provisions. Article I, section 12, requiring bail by sufficient sureties was mandated in 1974 by ballot Proposition 7, and is hereinafter referred to as Proposition 7.

and rules; (3) the existing release system's compliance with due process requirements; (4) the absence of judicial authority to enact the majority rules.

## I. LACK OF A JUSTICIABLE CONTROVERSY

According to *Blair* v. *Pitchess* (1971) 5 Cal.3d 258 [96 Cal.Rptr. 42, 486 P.2d 1242], a true case or controversy may exist when a taxpayer brings suit pursuant to Code of Civil Procedure section 526a by alleging illegal government activity.[4] (*Id.*, at p. 269.) No true case or controversy exists in the instant proceeding because no adversity exists between the parties despite the broad allowances of *Blair.*

After suit was brought defendant Donald Scott, as Chief of Police of the City and County of San Francisco, was relieved of all responsibility for pretrial detainees. He was thus eliminated as a legally interested party and the only remaining legally interested defendant—Sheriff Richard Hongisto—curiously stipulated prior to trial that the challenged system *is* unconstitutional. Instead of defending his office, defendant Hongisto presented evidence intended to assist *plaintiffs'* case. There was in fact no legally interested defendant committed to establishing the propriety of the present release procedures. This is dramatically illustrated by the majority's reliance at six different places (*ante,* pp. 435 (fn. 9), 436 (fn. 11), 437, 442, 443, and 444) on an article authored by no one other than defendant Hongisto (*Workable Alternatives to the Present Bail System* (1972) 47 State Bar J. 576) in support of various of their assertions.

When the only legally interested defendant is also an advocate for plaintiffs' position, there is no truly adversary proceeding and the proceeding becomes a sham.[5] There was simply no controversy between Sheriff Hongisto and plaintiffs. Therefore, the case is not justiciable. Under these circumstances great danger exists the trial court will be misled "by the failure of the parties to adequately explore and argue the issues." (*Blair* v. *Pitchess, supra,* 5 Cal.3d 258, 270.)

---

[4]Section 526a provides in pertinent part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of...the...funds...of a...city and county...may be maintained against any officer thereof...by a citizen resident therein...who is assessed for and is liable to pay...a tax therein."

[5]Incredibly, the majority state the "chief of police has vigorously opposed plaintiffs' contentions," arguing that as "in *Blair,*...'the extensive briefs in this case demon-

## II. THE RECORD AND FINDINGS OF FACT DO NOT SUPPORT MAJORITY CONCLUSIONS

It is indisputable and the record establishes that persons who are arrested and detained prior to trial incur an impairment in preparing for trial. However, reform of detention facilities is not the subject of this action and the record does not reveal that detainees are being deprived of due process. The majority's due process argument that the prosecution must bear its newly created burden of proving that arrestees should not be released on OR evidences a misunderstanding of what constitutes deprivation of procedural due process.

In support of their holding that individual liberty interests are compromised by existing procedures, the majority state that "[a]pproximately one-half of all detainees in San Francisco are unable to post bail and are not released on their own recognizance. As a direct result, they remain in jail until their cases are resolved." (*Ante*, p. 433.) The majority refer to no testimony, relying only on plaintiffs' brief setting forth a statistical argument riddled with deficiencies.[6] Without worthy supporting evidence the majority state that half the arrestees are confined for indigency. Heavy reliance is placed on the testimony of bail bondsman Al Graff who testified that "the people who are being released are the affluent. The poor are staying in jail." Again, curiously, Mr. Graff was not qualified as an expert witness on any issue. He cer-

---

strate...[that] [t]here is no danger...the court will be misled by the failure of the parties adequately to explore and argue the issues.'" (See *Blair v. Pitchess, supra*, 5 Cal.3d 258, 270; *ante*, p. 450.)

Such statement is remarkable when considering the only opposition to plaintiffs' petition for hearing submitted to this court by a named defendant is a seven-page answer to the petition challenging only plaintiffs' standing to sue under Code of Civil Procedure section 526a. Moreover, in recounting Scott's "vigorous" opposition, the majority note that defendant Scott called but three witnesses in the seven-day trial, the testimony of one of whom is extensively relied on by the majority in support of their assertions. (*Ante*, pp. 450, 451 (fn. 29), 452 (fn. 14).)

[6]The argument is that of approximately 56,000 San Francisco arrestees in 1974, roughly one-half were charged with misdemeanors and one-half with felonies. It is assumed, without any adequate evidentiary basis, that only one-half (14,000) of the misdemeanor arrestees were released on citation. Subtracting this figure from the 56,000 arrestees, a figure of 42,000 is arrived at, from which approximately 9,400 releases on bail and 2,900 releases through the San Francisco OR Project are subtracted. The result (29,700) is the number of arrestees hypothesized as remaining in pretrial confinement. This number inflates the number of actual detainees because plaintiffs assume that the only arrestees released on their own recognizance are those released under the auspices of the San Francisco OR Project, while totally ignoring the roles of private attorneys and the public defender.

tainly is not an expert on questions of affluency versus indigency. Nor do the trial court findings support the majority conclusion.[7] In fact, the trial court expressly disagrees with the majority, stating in its memorandum opinion: "The fact that an arrestee must remain in jail pending release is not due to his indigency. It is due to the fact that at the bail hearing the judge has determined, in the exercise of his broad discretion, that a particular accused should not be released on his own recognizance, but that in order to secure his appearance in court, more stringent safeguards are required—namely money bail or incarceration."

Not only is the record devoid of statistical or objective facts concerning San Francisco pretrial detentions, it also lacks evidence that any detainee who might have been released OR as proposed by the majority

[7]Findings of fact pertinent to OR release issues are as follows: "7. Arrestees remain in detention unless (a) released by citation, (b) released on own recognizance or (c) released on bail. [¶] 8. Upon being booked into City Prison, all arrestees (other than 'holds' and those charged with non-bailable offenses) are allowed immediate release upon the posting of a bail bond in the amount specified in the master bail schedule for the offenses charged or in such greater or lesser amount as may subsequently be set by court order. [¶] ... [¶] 9. Upon being booked into City Prison all arrestees (other than 'holds' and those charged with non-bailable offenses) are allowed to apply for release on own recognizance. Arrestees are allowed to apply to the San Francisco Bail Project for assistance in obtaining 'O.R.' releases. The Project staff interviews some arrestees and determines whether an individual has sufficient local contacts assuring probable appearance in court. [¶] The criteria for determining O.R. release include a local address and the length of time at such address, family ties, employment status and means of support and any prior criminal record. If sufficient criteria exist, the Project makes a recommendation to the court for release. In the court's discretion the arrestee may then be released on his own recognizance. If the court does not find sufficient local contacts assuring probability of appearance, or otherwise decides against release in its discretion, O.R. release is denied and release must be obtained on bail. [¶] The criteria utilized by the Project and eventually presented to the court in determining O.R. release are relevant to an arrestee's reliability to appear and are related to the purpose of assuring the arrestee's appearance at court proceedings. [¶] 10. Those arrestees who are unable to post bail have the right to apply to the court for O.R. release, and have the burden of proof in making such application. Generally, petitions for O.R. release are presented to the court by a staff member of the Project. [¶] 11. The power of the court to release an arrestee on his own recognizance is purely discretionary and permissive. The courts generally do not issue written findings and reasons for the granting or denial of O.R. releases. [¶] 12. The Project interviews some but not all willing applicants and if the criteria for O.R. release are met, only then is a recommendation made to the court. A substantial number of individuals are not recommended because the criteria are not met. All arrestees cannot be released on own recognizance. [¶] 13. Pretrial detention occurs either because arrestees lack financial resources to post bail or because the criteria for O.R. release are not met, or a combination of both. [¶] 14. As to some arrestees, bail appears to act as a deterrent to flight and give some assurance of appearance in court proceedings. The court is not convinced that all arrestees presently released on bail can safely be released on their own recognizance or that money bail should be eliminated as a form of deterrent to flight."

has in fact been prejudiced by reason of detention. Nor is there support for the majority conclusion that placing the burden of proof of appearing at trial on the arrestee, "is to create among trial courts a '. . .Pavlovian response of money bail [and hence a denial of OR release] to every uncertainty concerning the defendant.'" (*Ante*, pp. 438-439).

Nowhere in the record is there evidence of specific abuse of discretion by salivating judges in denying OR release. The facts on which the majority rely are gleaned from meager testimony consisting in the most part of overgeneralized and imprecise opinion evidence of nonexpert witnesses[8] and from unacknowledged law review notes which present 17-year-old statistical evidence obtained from the Manhattan Bail Project.[9] The majority's reliance on facts presented as worthy of judicial notice instead of record facts relevant to the San Francisco pretrial detention system constitutes an egregious abuse of the doctrine of judicial notice in quest of a desired result.

The absence of reliable and objective record facts on which the majority can properly rely is particularly significant because it confirms the thesis that there has been no bona fide adversary trial or justiciable controversy. In their fervor to make policy decisions the majority lack the information, skill and sophistication only a legislative body possesses. (See, *post*, part IV.) Defendant Hongisto's advocacy of plaintiffs' position and the absence of substantial evidence in defense of the constitutionally mandated pretrial detention system rendered the trial lacking in all traditional hallmarks of the adjudicative process. Trial of this case was not conducted as a bona fide adversary proceeding, and the case is now presented to this court in the form of a one-sided legislative hearing instead of a justiciable controversy. Naivete cannot explain the majority's enthusiasm in embracing the trial court's policy proclamations.

---

[8]Not only is Mr. Graff quoted for his opinion testimony but the majority also quote at length from the testimony of a deputy sheriff's opinion on the question of the moral deterioration of prisoners (*ante*, p. 437), rely on corroboration by "numerous courts and commentators" of what the majority deem to be favorable evidence (*ante*, p. 434) and rely on opinion testimony of "all witnesses" that "many persons. . .detained in San Francisco jails. . .could safely be released OR." (*Ante*, p. 442.)

[9]A substantial number of the majority's contentions are derived from Rankin, *The Effect of Pretrial Detention* (1964) 39 N.Y.U.L.Rev. 641, and Ares, *The Manhattan Bail Project: An Interim Report on the Use of Pretrial Parole* (1963) 38 N.Y.U.L.Rev. 67.

## III. Existing Procedures Meet Due Process Requirements

Assuming arguendo the validity of the majority's assumption that one-half of all arrestees are detained until trial, such detainment does not constitute deprivation of those detainees' due process rights. Upon arrest on probable cause, the criminal justice system is set into motion and the arrestee is subjected to constitutionally permissible deprivations of numerous individual liberties subject, however, to release on bail and an expeditious trial, among other things. To state as do the majority that "[a]n individual's interest in his freedom has always been held sacrosanct" (*ante*, p. 439) as a general maxim justifying a presumptive right to OR release for all arrestees, is to ignore the existence of due process safeguards inherent in the requirement that there be probable cause warranting deprivation of liberty pending process of the state's complaint.

In *People* v. *Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599 P.2d 622], relied upon by the majority, this court set forth guidelines for weighing private and governmental interests to evaluate whether procedures employed by the state safeguarded requisite procedural due process interests: "[I]dentification of the dictates of due process generally requires consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Id.*, at p. 269.)

An application of the dictates of *Ramirez* to the record facts in the instant case compels a conclusion—contrary to the majority holding—that an individual's liberty interest must be subordinated to the government's interest in assuring an arrestee's presence at trial.

As to the first guideline set forth in *Ramirez*, trial court findings are absolutely barren of reliable evidence in support of the majority's bold assertion that a detainee's liberty interest will be adversely affected by a system of discretionary OR release as an alternative to bail. As ex-

plained, the majority rely on imprecise opinion testimony and judicial notice of information and argument published in law review articles. The trial court did not find as a fact and plaintiffs completely failed to show that *any* detainee who might have been a good OR risk has been denied OR release under current San Francisco practices. Without such a showing of actual injury no due process denials could have occurred.

As to the second guideline, no evidence has been presented indicating risk of an "erroneous deprivation" of an individual's liberty interest through existing procedures. There are, moreover, numerous "additional or substitute procedural safeguards" to insure that a detainee will not be deprived of liberty without due process of law. Arrestees are entitled to a preliminary hearing (Pen. Code, § 859 et seq.) where they are represented by privately retained counsel or a public defender in exercising their right to challenge the existence of probable cause to sustain charges against them. If an arrestee still remains in custody, and does so because he cannot or will not meet the scheduled bail, he is entitled to move for a reduction in bail (Pen. Code, § 1269c), release on own recognizance (Pen. Code, § 1318), or release through pretrial diversion (Pen. Code, § 1001 et seq.). If an arrestee still remains in custody, he has a right to automatic judicial review of the order fixing his bail within five days from the time the order is given (Pen. Code, § 1320). Finally, any decision resulting in an arrestee's continued detention, such as fixing of bail, denial of OR release and the actual arrest may be challenged by the traditional routes such as habeas corpus or mandamus. *Ramirez* characterizes the nature of due process in stating "it must be remembered that 'due process is flexible and calls for such procedural protections as the particular situation demands.'" (*People* v. *Ramirez, supra*, 25 Cal.3d 260, 268.) It is clear that existing procedural due process safeguards are completely adequate.

*Ramirez*'s third guideline requires that a person's "dignitary interest" be safeguarded by being informed of the nature, grounds, and consequences of the action against him, and by enabling him to present his side of the story before a responsible government official. There are no findings or evidence indicating that arrestees have not been fully informed of the nature, grounds and consequences of charges and proceedings against them, or that arrestees were unable to present their side of the story to responsible government officials. It is clear that existing procedural due process safeguards more than adequately insure compliance with the third guideline set forth in *Ramirez*.

Finally, *Ramirez*'s fourth guideline requires the governmental interest in OR release be balanced against the arrestee's liberty interests. It must be obvious that the majority's creation of a right to OR release will have a profound and negative effect on the government's substantial and compelling interest in securing the arrestee's presence at future criminal proceedings. In fact, the trial court stated in its memorandum of decision that there is a *"compelling state interest* in securing the appearance of an accused at court proceedings." (Italics added.)

If the burden is shifted to the state to prove why OR release should be denied, common sense and past experience[10] indicate that the increased failure to appear at trial will have serious negative effects on the governmental interest. Any delay in expeditious prosecution of criminal defendants will adversely affect prosecutorial efforts. When defendants fail to appear for any court proceeding, as will be the case when OR release is made a right, further prosecutions of their cases cease until they are again arrested and brought to court. When a defendant fails to appear at trial, witnesses disappear and their memories fade. Police and district attorney personnel who had originally processed the case may not be available. Witnesses may be subject to intimidation. Evidence may be lost or destroyed. If one defendant fails to appear, the case will progress as to the remaining defendants, resulting in a de facto severance contrary to the policy established in Penal Code section 1098, all of which increases costs to the state and to the taxpayer in prosecuting those charged with crimes.

Moreover, failure to secure appearance of the accused at future court-ordered appearances entails indirect burdens on the government by harming society. A defendant who is a fugitive may commit additional crimes. If the defendant is in need of treatment relative to the use of drugs or alcohol, or of psychiatric rehabilitation, such assistance is delayed. The deterrent effect of punishment is diminished after a long delay. Public funds must be spent to relocate and rearrest a fugitive, sometimes requiring the expense of extradition. In cases such as murder, rape, or child molestation, a delay prolongs the mental anguish of the surviving victims and witnesses. If the failure to appear occurs on jury trial day, there is a waste of public funds used to pay for the expenses and fees of jurors, victims, and witnesses who have been

---

[10]An example of how jump rates increase when own recognizance release programs are expanded is documented in a study cited in Mosk, *The Purpose of Bail in the Administration of Justice* (Jan. 1973) 54 Chi.Bar Rec. 183, 188-189.)

summoned for trial, not to mention the cost of providing for a trial court that may go unused.

Finally, any delay in expeditious prosecution of criminal defendants operates in the fugitive defendant's favor. Moreover, a cunning fugitive in our mobile society may avoid apprehension altogether.

The majority's conclusion that procedural safeguards in the existing pretrial detention system in San Francisco deprives detainees of fundamental liberty and due process of law is contrary to the very *Ramirez* guidelines on which the majority purport to rely for balancing governmental against individual interests. In view of existing pretrial due process procedures, the majority's failure to substantiate their claim that arbitrary pretrial adjudicative procedures exist in San Francisco with record evidence and the fact that a "compelling" and "substantial" state interest exists in securing the presence of an arrestee at future proceedings against him wholly vitiate the majority's conclusion that existing procedural safeguards are unconstitutional.[11]

## IV. The Majority Engage in Judicial Legislation

A central issue in this case is whether this court has authority to modify constitutionally mandated pretrial release procedures, especially in view of existing procedural due process guarantees. (See, *ante*, part III.) Authority for court modification is not found in Proposition 7. That proposition provides an "absolute right" to bail (*In re Newbern* (1961) 55 Cal.2d 500, 503 [11 Cal.Rptr. 547, 360 P.2d 47]) whereas OR release, which the majority now create as a right, is only "an alternative to bail in appropriate cases." (*In re Smiley* (1967) 66 Cal.2d 606, 613 [58 Cal.Rptr. 579, 427 P.2d 179].) OR release is not a matter of right but a matter of court discretion depending on whether good cause is shown for release. While this court has a general power to interpret constitutional provisions consistent with due process requirements, it has no authority to provide new meanings to define the

---

[11]Although the majority elect not to analyze the bail system under federal equal protection and due process grounds, such an analysis would similarly fail. Even if the majority could find evidence to support a contention that a legislative classification invidiously discriminated against indigents, such a classification scheme would not be subject to attack because (1) the Supreme Court of the United States has explicitly held that wealth is not a suspect classification (*San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 28-29 [36 L.Ed.2d 16, 40, 93 S.Ct. 1278, 1294]), and (2) a rational basis for bail exists.

express language of the Constitution (*Ross* v. *City of Long Beach* (1944) 24 Cal.2d 258 [148 P.2d 649]), or to revise a system expressly established by a constitutional command of equal dignity to due process mandates. If, as the majority argue, a conflict exists between due process requirements and Proposition 7's explicit establishment of bail as a matter of right and discretionary OR release, this court is required to adhere to the specific constitutional provision insofar as the two are capable of being constitutionally harmonized.

Proposition 7's explicit creation of bail as a right and OR release as a discretionary alternative constitute an establishment of standards and procedures which under our tripartite system of representative government are to be implemented not by this court but by the Legislature. (See *People* v. *Municipal Court* (*Runyan*) (1978) 20 Cal.3d 523 [143 Cal.Rptr. 609, 574 P.2d 425].) This court lacks "quasi-legislative rule-making power." (*Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834, 948 [117 Cal.Rptr. 437, 528 P.2d 45].) Moreover, when rules and procedures enacted by the Legislature are consistent with the constitutional mandate they cannot be qualified by this court. (*People* v. *Municipal Court* (*Runyan*), *supra*, 20 Cal.3d 523.)

The initiative to modify OR release procedures adopted by the majority in this case not only offends Proposition 7, but usurps legislative prerogative—even assuming arguendo such initiative is constitutionally permissible. In fact, the Legislature has not been remiss in addressing this serious issue. Assemblyman Berman introduced Assembly Bill No. 2 in December 1978 (approved Sept. 1979, eff. Jan. 1981), substantially reforming release procedures. (Stats. 1979, ch. 873 (No. 8 West's Cal. Legis.Service, p. 3363; No. 5 Deering's Adv.Legis.Service p. 626).) The Berman bill significantly reforms pretrial detention by providing in section 1270 that persons arrested for misdemeanors are entitled to OR release as a matter of right, "[U]nless the court makes a finding upon the record that an own recognizance release will not reasonably assure the appearance of the defendant as required." It further provides in section 1269d that a person arrested for a misdemeanor who is not entitled to OR release need post only 10 percent of the fixed bail to obtain release.[12] Although the Legislature has not created new rules pertaining to felony arrestees this fact does not vest in this court a right to usurp the Legislature's rule-making function by legislating under the guise of

---

[12]We are not now called upon to express any view as to the validity of the Berman bill, as upon a proper challenge thereto.

judging. The Berman bill is a significant reminder that the proper branch of government to initiate appropriate reforms within constitutional limits is the Legislature and not this court.[13]

The majority's conclusions are clearly erroneous. But the majority's most serious error is in abandoning the court's traditional role of appellate review by improperly creating political policy. We again usurp the jurisdiction of the Legislature and other rule-making agencies of this state.

The judgment should be reversed and the trial court directed to dismiss the action.

Richardson, J., and Manuel, J., concurred.

The petition of appellant Scott for a rehearing was denied August 14, 1980, and the opinion was modified to read as printed above. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.

---

[13]The majority's failure to specify the degree of the burden of proof placed on the prosecution is a technical flaw in their opinion, demonstrating a court's lack of legislative skills.