[No. A094813. First Dist. Div. One. Jan. 22, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL R. ORMISTON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. This opinion is to be published in full, with the exception of part II.

**COUNSEL**

Robert Wayne Gehring, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, and Michele J. Swanson, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**SWAGER, J.**—Appellant was convicted following a trial before the court of three counts of manufacturing methamphetamine (Health & Saf. Code, § 11379.6, subd. (a)), three counts of possession of the components to manufacture methamphetamine (Health & Saf. Code, § 11383, subd. (c)(1)), two counts of possession of hydriotic acid to manufacture methamphetamine (Health & Saf. Code, § 11383, subd. (c)(2)), one count of transporting methamphetamine (Health & Saf. Code, § 11379, subd. (a)), one count of possession of marijuana (Health & Saf. Code, § 11357, subd. (b)), and two counts of possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)). The trial court also found that two enhancements for committing offenses while released on bail or own recognizance (Pen. Code, § 12022.1) were true.[1] Appellant was sentenced to a total of 10 years and four months in state prison.

He claims in this appeal that no evidence in support of the conviction for transportation of methamphetamine was presented, a confidential informant should have been disclosed, and the enhancements under section 12022.1 cannot be imposed for commission of offenses while in drug diversion. We find that appellant committed transportation of methamphetamine by means of walking, and the motion for disclosure of the confidential informant was properly denied, but reverse the section 12022.1 enhancements for lack of evidence that appellant was released on bail or his own recognizance.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The convictions are based upon a series of incidents that occurred over a period of more than one year, after a felony complaint had been filed in a separate case, *People v. Ormiston* (Super. Ct. Contra Costa County, No. 03-181285-8) in November of 1997 that charged appellant with possession of methamphetamine, and thereafter, in August 1998, resulted in his placement in a drug diversion program pursuant to section 1000.

*Counts 8, 9 and 10—October of 1998*

Testimony was presented that on the night of October 13, 1998, appellant processed and cooked methamphetamine in a shed on residential property located at 3605 Wren Avenue in Concord, with the assistance of his friend Danny Bennett.[2] The next day, the shed, a garbage container, and a cottage on the property were searched by officers of the Concord Police Department. Chemicals, including hydriotic acid, equipment, and other materials associated with the manufacture of methamphetamine, were seized during the search, as was methamphetamine residue. Based upon the evidence seized, expert opinion testimony established that methamphetamine had been manufactured in the shed.

*Count 7—November 24, 1998*

At the Longs Drug Store on Ygnacio Valley Road in Concord on October 21, 1998, and again on November 24, 1998, appellant purchased large quantities of cold tablets, which contain ephedrine that is extracted to manufacture methamphetamine. An employee at the store called the police to report the purchases, and subsequently selected appellant's photograph from a lineup as the purchaser.

*Counts 5 and 6—November 25, 1998*

On the morning of November 25, 1998, in response to information that appellant had purchased ephedrine pills, officers of CNET, a multiagency drug task force, conducted a search of room 328 at the Extended Stay America Hotel at 3220 Buskirk Avenue in Pleasant Hill, where appellant was reportedly staying. The hotel room was unoccupied, but the search uncovered methamphetamine and equipment, chemicals and other materials used to manufacture methamphetamine, along with "indicia" that appellant

---

[2]Bennett lived in a cottage to the rear of the property with his girlfriend; the property was owned by the parents of Bennett's girlfriend, who lived in the main residence at the front of the property.

was one of the current occupants of the room. The code for the card key to the room was changed, and the hotel office staff was asked to contact the officers if anyone returned to the room.

That afternoon, the CNET officers were advised that appellant had just returned to the hotel and requested a new card key for room 328. As the officers reached the hotel, appellant was observed "walking southbound away from the hotel" in the parking lot. When appellant saw the marked patrol vehicles, he threw his card key for the hotel room "down in the shrubs" immediately before he was detained and arrested. Three baggies of "wet" methamphetamine powder in quantities "generally possessed for more than just personal use," a hypodermic syringe, and a digital scale were found in appellant's jacket pocket. An expert offered the opinion that the wet methamphetamine had been "recently produced" within the past "couple of hours."

*Counts 1 Through 4—July 26, 1999*

Anthony Davi, the manager of El Monte Building Supply and Storage on Clayton Road in Concord, testified that after the gates to the facility had been locked on the evening of July 26, 1999, he observed appellant in a vacant, open storage locker in a kneeling position, wearing a small face mask, "brewing" a "few things" with a "little flame." Davi recognized appellant from previous encounters as a friend of Ken Woods, who rented a trailer on the premises. Davi asked appellant, "What are you doing here?" Appellant was "stunned," but replied, "See Ken," before he quickly left. Davi proceeded to Woods's trailer and "banged on the door," but when he received no response he returned to his office and immediately called the police.

When police officers arrived, a "strong chemical odor" was detected emanating from the storage locker. Inside the storage locker were found hot plates with substances that were still "bubbling." Woods was discovered in his trailer under the influence of methamphetamine. A search of the trailer and storage locker resulted in the seizure of more equipment and materials "used in the process of manufacturing meth." A large quantity of methamphetamine—in an amount that indicated possession for sale—was also found in the trailer.

*Counts 11 and 12—October 17, 1999*

Concord police officers noticed appellant riding a bicycle on Clayton Road on the night of October 17, 1999. After appellant made "eye contact" with the officers, he "started pedaling faster," then discarded items in his

possession into a "tan bark area" near the sidewalk. The discarded items included baggies filled with marijuana and methamphetamine powder.

*Count 13—November 18, 1999*

When appellant was arrested pursuant a warrant in an apartment on Montclair Drive in Concord on November 18, 1999, a "dime bag with a white powdery substance" that tested positive for methamphetamine was taken from his left front pants pocket.

## DISCUSSION

I. *Walking as a Basis for a Conviction of Transportation of Methamphetamine (Count 6).*

 Appellant complains that he cannot be convicted of the offense of transportation of methamphetamine without use of a vehicle. The conviction of a violation of Health and Safety Code section 11379 (hereafter section 11379) is based upon the discovery of methamphetamine in appellant's possession as he walked across the parking lot of the Extended Stay America Hotel. Appellant asserts that the more severe penalties imposed for transportation of methamphetamine pursuant to section 11379 were not intended by the Legislature to "include walking while in possession."

The uncomplicated issue, which nevertheless appears not to have been previously resolved, is whether walking may be a form of transportation for purposes of section 11379, which provides that "every person who *transports* . . . any controlled substance . . . shall be punished by imprisonment in the state prison for a period of two, three, or four years." (Italics added.)[3] " 'Transport,' as used in this statute, has no technical definition," but rather "as used in the statute is 'commonly understood and of a plain, nontechnical meaning.' (*People v. Eastman* (1993) 13 Cal.App.4th 668, 673-677 [16 Cal.Rptr.2d 608].)" (*People v. LaCross* (2001) 91 Cal.App.4th 182, 185 [109 Cal.Rptr.2d 802].) "Transportation of a controlled substance is established by carrying or conveying a usable quantity of a controlled substance with knowledge of its presence and illegal character." (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1746 [45 Cal.Rptr.2d 844]; see also *People v. Emmal* (1998) 68 Cal.App.4th 1313, 1315-1316 [80 Cal.Rptr.2d 907].) "The crux of the crime of transporting is movement of the contraband from one place to another." (*People v. Kilborn* (1970) 7 Cal.App.3d 998, 1003 [87 Cal.Rptr. 189]; see also *People v. LaCross, supra,* at p. 185; *People v. Arndt* (1999) 76 Cal.App.4th 387, 398 [90 Cal.Rptr.2d 415].)

---

[3]A number of cases have considered the meaning of the term "transport" in the context of the movement of drugs other than by walking.

The evidence indisputably establishes the movement of methamphetamine by appellant from one place to another. After a methamphetamine processing enterprise was discovered in a hotel room jointly occupied by appellant, later the same day he was detained while "walking southbound away from the hotel" with three baggies of "recently manufactured" methamphetamine powder in his jacket pocket. Appellant's use of foot travel, rather than some other means of conveyance, to take the methamphetamine to whatever destination he intended to reach, does not negate the element of transportation. Section 11379 neither mentions nor excludes from its scope any particular means of transportation. A violation of the statute requires movement of the controlled substance to another location, but not the use of a mechanized or motorized means of delivery. It is the trafficking in controlled substances, not the method used to achieve it, that is the misconduct the statute seeks to prevent. The statute "is intended to inhibit the trafficking and proliferation of controlled substances by deterring their movement." (*People v. Arndt, supra,* 76 Cal.App.4th 387, 398; see also *People v. Holquin* (1964) 229 Cal.App.2d 398, 402 [40 Cal.Rptr. 364].)

Inclusion of walking within the statutory definition of "transport" is consistent with the purpose of the statute. ■ Our high court explained in *People v. Rogers* (1971) 5 Cal.3d 129, 136-137 [95 Cal.Rptr. 601, 486 P.2d 129], that by imposing more severe penalties for transportation of controlled substances,[4] "[t]he Legislature was entitled to assume that the potential for harm to others is generally greater when narcotics are being transported from place to place, rather than merely held at one location. The Legislature may have concluded that the potential for increased traffic in narcotics justified more severe penalties for transportation than for mere possession or possession for sale, without regard to the particular purpose for which the transportation was provided, a matter often difficult or impossible to prove. Moreover, a more severe penalty for those who transport drugs may have been deemed appropriate to inhibit the frequency of their own personal use and to restrict their access to sources of supply, or to deter the use of drugs in vehicles in order to reduce traffic hazards and accidents, as well as to deter occurrences of sales or distributions to others." (Fns. omitted; see also *People v. LaCross, supra,* 91 Cal.App.4th 182, 186.) "Thus, a prohibition on the simple transportation of drugs affects the transporter's ability to make sales or purchases of contraband; it reduces the risks of traffic accidents due to drivers under the influence; and it arguably even reduces the frequency of personal drug use by discouraging users from carrying supplies in vehicles." (*People v. Eastman, supra,* 13 Cal.App.4th 668, 676, fn. omitted.) A more severe penalty for those who transport drugs may also have been deemed

---

[4]The court in *Rogers* analyzed Health and Safety Code former section 11531, the statute that proscribes transportation of marijuana.

necessary to inhibit the frequency of their own personal use and to restrict their access to sources of supply, as well as to deter occurrences of sales or distributions to others. (*People v. Cortez* (1985) 166 Cal.App.3d 994, 1001 [212 Cal.Rptr. 692].)

 While movement of methamphetamine by walking does not increase the incidence of traffic accidents to the same extent as transportation in motor vehicles, or even bicycles (*People v. LaCross, supra,* 91 Cal.App.4th 182, 186-187), the paramount objective of the statute to inhibit trafficking, proliferation, distribution and access to controlled substances is similarly furthered by proscribing delivery of controlled substances by foot travel. The essence of the offense of transportation is the movement of controlled substances from one location to another to facilitate the purpose associated with conveyance of the drugs. Walking may not be the most efficient or expeditious means available for long-distance transportation of controlled substances, but it is often the most feasible way to complete deliveries to locations in close geographic proximity. The legislative purpose behind section 11379 is effectuated by discouraging "*any* illicit transportation of controlled substances" to another location, even if the distance is insignificant. (*People v. Emmal, supra,* 68 Cal.App.4th 1313, 1317.) "[T]he statute prohibits transportation—any transportation—because the Legislature deems it important to discourage the distribution and use of dangerous drugs and the risks that attend use of them during their movement from one place to another." (*Id.,* at pp. 1318-1319.) A conclusion that walking does not constitute transportation of a controlled substance within the meaning of section 11379, would give drug traffickers a free ride—so to speak—to move drugs by foot travel without violating section 11379, sanction one form of conveyance of drugs while continuing to criminalize all others, and often effectively eliminate the crime of transportation for local or neighborhood movement of drugs. We do not think any of these consequences were intended by the Legislature.

Finally, we are not persuaded by appellant's argument that if transportation pursuant to section 11379 may be committed merely by walking, the statute will impermissibly reach those who venture aimlessly by foot within their own homes, even a person "illegally possessing a controlled substance in his or her pocket, who gets up and walks to answer the door when the police knock." First, appellant was not merely moving drugs in a residence without any destination; he was taking recently processed methamphetamine to some intended location as he walked across the hotel parking lot away from his room. Moreover, the requirement of volitional transport of methamphetamine from *one location to another* avoids any unwarranted extension of the statute to restrained minimal movement within a residence or other

confined area that does not facilitate trafficking, distribution or personal use of drugs. We therefore conclude that the term "transport" in section 11379 encompasses moving controlled substances from one place to another by walking.[5]

II. *The Denial of the Motion to Disclose the Identity of the Confidential Informant.**

. . . . . . . . . . . . . . . . . . . . . . . . . .

III. *The Findings on the Section 12022.1 Enhancements.*

Appellant also argues that the section 12022.1 enhancements associated with counts 11 and 13 "must be reversed for lack of sufficient evidence." Section 12022.1, subdivision (b), reads: "Any person arrested for a secondary offense which was alleged to have been committed while that person was released from custody on a primary offense shall be subject to a penalty enhancement of an additional two years in state prison which shall be served consecutive to any other term imposed by the court." Appellant committed counts 11 and 13 after criminal proceedings against him in *People v. Ormiston, supra,* No. 03-181285-8, on a charge of possession of methamphetamine were suspended and he was ordered into diversion pursuant to section 1000 on August 20, 1998. The diversion order stated that appellant "is released on his own recognizance and bail is exonerated." Appellant also executed a diversion agreement in which he promised to abide by specified statutory conditions: to attend a certified program of drug education and counseling, abstain from possession or use of controlled substances, pay a diversion fee, submit to drug testing, and report to the probation department as directed. While in the diversion program, appellant committed the additional offenses, diversion was terminated, and the criminal proceedings in *People v. Ormiston, supra,* No. 03-181285-8, were reinstated. ▮ Appellant's position is that his placement in drug diversion "is not the 'functional equivalent' of a release on one's own recognizance while awaiting trial," and therefore the enhancement findings under section 12022.1 lack any supporting evidence. We agree.

To resolve the issue of statutory interpretation we analyze both the drug diversion statutes and section 12022.1. ▮ Our role in construing the statutes is to ascertain the intent of the Legislature so as to effectuate the

---

[5]We observe that any exclusion of walking from the methods of conveyance that constitute transportation of a controlled substance under section 11379 is for the Legislature, not this court.

*See footnote, *ante,* page 676.

purpose of the law. (*People v. Jefferson* (1999) 21 Cal.4th 86, 94 [86 Cal.Rptr.2d 893, 980 P.2d 441].) ■ " ' " " 'Penal Code sections must generally be construed " 'according to the fair import of their terms, with a view to effect its objects and to promote justice.' " ' [Citations.] [¶] 'Consistent with that general principle, appellate courts first examine the language of the code section to determine whether the words used unequivocally express the Legislature's intent. If no ambiguity, uncertainty, or doubt about the meaning of the statute appear, the provision is to be applied according to its terms without further judicial construction. [Citations.] [¶] When the language of the section is on its face ambiguous or leaves doubt, . . . the court must resort to extrinsic aids to ascertain the purpose behind the statute and give the provision a judicially created meaning commensurate with that purpose. [Citation.]' [Citations]" ' [Citation.]" (*People v. Franz* (2001) 88 Cal.App.4th 1426, 1440 [106 Cal.Rptr.2d 773]; see also *People v. Avila* (2000) 80 Cal.App.4th 791, 796 [95 Cal.Rptr.2d 651].) ■ Finally, when a statute defining a crime or punishment is susceptible to two reasonable interpretations, we will "ordinarily adopt that interpretation more favorable to the defendant." (*People v. Avery* (2002) 27 Cal.4th 49, 57 [115 Cal.Rptr.2d 403, 38 P.3d 1]; see also *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 312-313 [58 Cal.Rptr.2d 855, 926 P.2d 1042].) However, "although true ambiguities are resolved in a defendant's favor, an appellate court should not strain to interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative intent." (*People v. Avery, supra,* at p. 58.)

Although section 12022.1 is not ambiguous on its face, the statute in rather general language prescribes a mandatory two-year enhancement where the defendant commits a second offense while "released from custody on a primary offense." (§ 12022.1, subd. (b).) The primary offense is then defined in more limited terms in subdivision (a)(1), as "a felony offense for which a person has been released from custody *on bail or on his or her own recognizance* prior to the judgment becoming final, including the disposition of any appeal, or for which release on bail or his or her own recognizance has been revoked. . . ." (Italics added; see also *In re Ramey* (1999) 70 Cal.App.4th 508, 512 [82 Cal.Rptr.2d 849].) Thus, "section 12022.1 permits the imposition of an additional two-year term (enhancement) to be served consecutively to the term being imposed for a criminal offense (secondary offense), . . . if the defendant committed the secondary offense while on *bail or own recognizance release pending trial or appeal on another charge* (primary offense)." (*People v. Adams* (1993) 6 Cal.4th 570, 572 [24 Cal.Rptr.2d 831, 862 P.2d 831], italics added, fns. omitted.)

While nothing in the language of section 12022.1 specifically includes within its coverage drug diversion, or any other release of a defendant other

than through bail or own recognizance (§ 1318), our Supreme Court's decision in *In re Jovan B.* (1993) 6 Cal.4th 801, 815 [25 Cal.Rptr.2d 428, 863 P.2d 673], extended the scope of the statute to reach a house release in a juvenile proceeding, which was considered the "functional equivalent" of an adult own recognizance release under section 12022.1. Based on this language, the Attorney General argues that the grant of diversion to appellant for the primary offense was also the functional equivalent of a release pursuant to section 1318, and the section 12022.1 enhancements promote the objective of the statute to impose additional punishment upon repeat offenders.

■ "[T]he purpose and intent behind a section 12022.1 enhancement, generally speaking, is . . . to penalize *recidivist* conduct with increased punishment." (*People v. McClanahan* (1992) 3 Cal.4th 860, 868 [12 Cal.Rptr.2d 719, 838 P.2d 241].) The more specific purpose of the on-bail enhancement is to "discourage a certain type of recidivist behavior," by deterring "the commission of new felonies by persons released from custody on an earlier felony." (*People v. Watkins* (1992) 2 Cal.App.4th 589, 593 [3 Cal.Rptr.2d 563]; see also *People v. McClanahan, supra,* at pp. 868-869.) "[S]ection 12022.1 'is intended " ' "to meet public concern over offenders who are arrested [and] then allowed back on the street a short time later to commit more crimes," ' " ' . . . and to recognize such an offender's ' " 'breach of the terms of his special custodial status . . . .' " ' (*In re Jovan B., supra,* 6 Cal.4th at p. 813, quoting *People v. McClanahan, supra,* 3 Cal.4th at pp. 867-871, italics omitted.)" (*In re Rottanak K.* (1995) 37 Cal.App.4th 260, 281-282 [43 Cal.Rptr.2d 543]; see also *People v. McNeely* (1994) 28 Cal.App.4th 739, 743 [33 Cal.Rptr.2d 582]; *People v. Esquibel* (1992) 3 Cal.App.4th 850, 858 [5 Cal.Rptr.2d 47].) ■ While drug offenders who are diverted from the criminal process into a drug treatment program but thereafter commit crimes may fall within the scope of the general objective of section 12022.1 to penalize recidivist conduct by persons released from custody, there are glaring, essential differences between release on bail or own recognizance (OR) and referral to a diversion program under the deferred judgment statutes.[7] (See *In re York* (1995) 9 Cal.4th 1133, 1146 [40 Cal.Rptr.2d 308, 892 P.2d 804].) "[T]he California Supreme Court

[7]"Commencing in December 1972, sections 1000-1000.4 provided for diversion of defendants charged with enumerated drug offenses including possession of a controlled substance. (Stats. 1972, ch. 1255, § 17, pp. 2469-2471.) Under the diversion program, an eligible defendant did not plead guilty but was diverted and referred for education, treatment, or rehabilitation for a period from six months to two years. Upon satisfactory completion of the diversionary program, the charges were dismissed and the underlying arrest was deemed not to have occurred." (*People v. Davis* (2000) 79 Cal.App.4th 251, 254 [93 Cal.Rptr.2d 905].)

"[E]ffective January 1, 1997, the Legislature amended sections 1000-1000.4 so as to replace diversion with deferred entry of judgment. (Stats. 1996, ch. 1132, § 2.) Under the

in *York* drew a clear distinction between an OR release and release by way of diversion. (*In re York, supra*, 9 Cal.4th 1133, 1146.)" (*Terry v. Superior Court* (1999) 73 Cal.App.4th 661, 665 [86 Cal.Rptr.2d 653].)

The sole issue at a bail or OR hearing is whether the detainee will appear for subsequent court proceedings if released, and the sole purpose is to ensure the defendant's attendance in court when it is required. (*Van Atta v. Scott* (1980) 27 Cal.3d 424, 438 [166 Cal.Rptr. 149, 613 P.2d 210]; *In re Underwood* (1973) 9 Cal.3d 345, 348 [107 Cal.Rptr. 401, 508 P.2d 721]; *In re Bright* (1993) 13 Cal.App.4th 1664, 1671-1672 [17 Cal.Rptr.2d 105]; *People v. Surety Ins. Co.* (1978) 77 Cal.App.3d 533, 537 [143 Cal.Rptr. 661].) Pursuant to article I, section 12 of the California Constitution and Penal Code section 1318, "a defendant charged with a bailable offense who seeks pretrial release from custody typically has two options: post bail and obtain release, or seek the privilege of OR release. Under section 1318, a defendant who seeks OR release may obtain such release only if he or she (1) promises to appear at all further proceedings, (2) promises not to depart from the state without leave of the court, (3) agrees to waive extradition in the event he or she fails to appear as required and is apprehended outside the State of California, and (4) promises 'to obey all reasonable conditions imposed by the court or magistrate.'" (*In re York, supra,* 9 Cal.4th 1133, 1139-1141.)[8]

---

deferred entry of judgment program for drug abuse, a defendant charged with certain enumerated drug offenses, including possession of a controlled substance, may enter a plea of guilty, participate in a drug rehabilitation program, and, upon completion of the program, have the charges dismissed. The provisions for deferred entry of judgment are available if a defendant satisfies the requirements set forth in section 1000, subdivision (a)(1)-(6). The court then must determine whether the defendant is suitable for participation pursuant to section 1000.2. This requires the court to determine whether the defendant would be 'benefited' by the deferred entry of judgment procedure. (§ 1000.2.) If found suitable, the defendant must waive the right to a speedy trial, plead guilty and thereafter participate in a designated program for at least 18 months, but no longer than three years. (§§ 1000.1, 1000.2.) If the defendant fails to perform satisfactorily, the prosecutor, the probation officer, or the court on its own motion may seek entry of judgment. (§ 1000.3.) If the court finds the defendant has failed to perform satisfactorily, 'the court shall render a finding of guilt to the charge . . . , enter judgment, and schedule a sentencing hearing . . . .' (§ 1000.3.) The defendant's plea of guilty does not constitute a conviction for any purpose unless a judgment of guilty is entered as provided in section 1000.3. (§ 1000.1, subd. (d).)" (*People v. Davis, supra,* 79 Cal.App.4th 251, 255-256, italics and fns. omitted.) We will use the terms "deferred judgment" and "diversion" interchangeably to refer to the present statutory scheme.

[8]Section 1318 reads: "(a) The defendant shall not be released from custody under an own recognizance until the defendant files with the clerk of the court or other person authorized to accept bail a signed release agreement which includes: [¶] (1) The defendant's promise to appear at all times and places, as ordered by the court or magistrate and as ordered by any court in which, or any magistrate before whom the charge is subsequently pending. [¶] (2) The defendant's promise to obey all reasonable conditions imposed by the court or magistrate.

In contrast, under the deferred judgment statutes, a defendant is not released from custody prior to judgment or "pending trial or appeal on another charge." (Cf. *People v. Adams, supra,* 6 Cal.4th 570, 572; *People v. Cole* (1994) 23 Cal.App.4th 1672, 1677 [28 Cal.Rptr.2d 788].) Defendants may and often are separately released from custody on bail or OR long before they are granted deferred entry of judgment and diversion, as was appellant. Thus, diversion does not seek to ensure appearance at subsequent criminal proceedings. "The primary purpose of the diversion statutes is rehabilitation." (*People v. Bishop* (1992) 11 Cal.App.4th 1125, 1130 [15 Cal.Rptr.2d 539]; see also *Frederick v. Justice Court* (1975) 47 Cal.App.3d 687, 691 [121 Cal.Rptr. 118].) "Penal Code sections 1000 to 1000.4, enacted in 1972, authorize the courts to 'divert' from the normal criminal process persons who are formally charged with first-time possession of drugs, have not yet gone to trial, and are found to be suitable for treatment and rehabilitation at the local level. The purpose of such legislation . . . is two-fold. First, diversion permits the courts to identify the experimental or tentative user before he becomes deeply involved with drugs, to show him the error of his ways by prompt exposure to educational and counseling programs in his own community, and to restore him to productive citizenship without the lasting stigma of a criminal conviction. Second, reliance on this quick and inexpensive method of disposition, when appropriate, reduces the clogging of the criminal justice system by drug abuse prosecutions and thus enables the courts to devote their limited time and resources to cases requiring full criminal processing." (*People v. Superior Court (On Tai Ho)* (1974) 11 Cal.3d 59, 61-62 [113 Cal.Rptr. 21, 520 P.2d 405], fn. omitted; see also *Terry v. Superior Court, supra,* 73 Cal.App.4th 661, 664.)

Once a diversion order is entered, no trial or other criminal proceeding remains pending. "Under Penal Code section 1000 et seq., eligible drug offenders may be considered for a diversion program in lieu of criminal prosecution. (*Morse v. Municipal Court* (1974) 13 Cal.3d 149, 153 [118 Cal.Rptr. 14, 529 P.2d 46].) . . . The court must find that the defendant would be benefited by diversion and the defendant must consent to the diversion proceedings, waiving his right to a speedy trial. (Pen. Code, §§ 1000.1-1000.2.)" (*People v. Fleming* (1994) 22 Cal.App.4th 1566, 1569-1570 [28 Cal.Rptr.2d 78].) "The deferred entry of judgment statutes . . . provide that first time drug offenders who meet specified conditions 'bypass the normal criminal process and enter a drug treatment program.' (*Terry v.*

[¶] (3) The defendant's promise not to depart this state without leave of the court. [¶] (4) Agreement by the defendant to waive extradition if the defendant fails to appear as required and is apprehended outside of the State of California. [¶] (5) The acknowledgment of the defendant that he or she has been informed of the consequences and penalties applicable to violation of the conditions of release."

*Superior Court*[, *supra,*] 73 Cal.App.4th 661, 663-664 . . . .)" (*In re Scoggins* (2001) 94 Cal.App.4th 650, 654 [114 Cal.Rptr.2d 508], fn. omitted; see also *People v. Sturiale* (2000) 82 Cal.App.4th 1308, 1312-1313 [98 Cal.Rptr.2d 865].)[9] Not only are criminal proceedings suspended, but "the accused is required to enter a guilty plea, and formal judgment is deferred." (*Terry v. Superior Court, supra,* at p. 664, fn. omitted; see also *People v. Cisneros* (2000) 84 Cal.App.4th 352, 356 [100 Cal.Rptr.2d 784]; *People v. Brackett* (1994) 25 Cal.App.4th 488, 493 [30 Cal.Rptr.2d 557].) If diversion is successfully completed, the charges are dismissed and the defendant is spared "the stigma of a criminal record." (*Morse v. Municipal Court, supra,* at p. 157; see also *Terry v. Superior Court, supra,* at p. 664.)[10] The legal effect of diversion is thus not the release of the defendant, but instead the suspension of criminal proceedings while the diversion program continues. In fact, according to the diversion order, appellant's bail was exonerated, such as occurs as a matter of law when judgment is pronounced or probation is granted. (§ 1195; *People v. American Surety Ins. Co.* (2001) 88 Cal.App.4th 762, 766 [106 Cal.Rptr.2d 235].)

Diversion and release on bail or OR are also governed by distinct standards. Section 1318 specifies the terms and conditions to which defendants must agree in writing in order to secure release on OR. (*People v. Jenkins* (1983) 146 Cal.App.3d 22, 27 [193 Cal.Rptr. 854].) "In interpreting the original version of section 1318, the appellate courts held that, '[i]n setting the amount of bail or other conditions of release, the primary issue, before or after conviction, is whether the detainee will appear for subsequent court proceedings. [Citations.] . . . Indeed, whether the defendant will subsequently appear is the sole issue at preconviction OR release hearings. [Citation.] ■ Accordingly, the ". . . court's discretion to impose conditions upon [a preconviction] OR release is limited to conditions which are reasonably related to and attempt to insure subsequent court appearances."

---

[9]"To be eligible for a deferred entry of judgment, a plea of guilty must be coupled with a determination that the defendant and the circumstances resulting in his or her arrest satisfy six criteria. (§ 1000, subd. (a)(1)-(6).) Included among them is the absence of 'evidence of a violation relating to narcotics or restricted dangerous drugs other than a violation of the sections listed in this subdivision.' (§ 1000, subd. (a)(3).) That assessment is made by the district attorney, who 'shall review his or her file to determine whether or not paragraphs (1) to (6), inclusive, of subdivision (a) apply to the defendant.' (§ 1000, subd. (b).)" (*People v. Sturiale, supra,* 82 Cal.App.4th 1308, 1313.)

[10]According to section 1000.3, if a defendant performs satisfactorily during the deferral period, "the criminal charge or charges shall be dismissed." (§ 1000.3.) Section 1000.4, subdivision (a), provides: "Upon successful completion of a deferred entry of judgment program, the arrest upon which the judgment was deferred shall be deemed to have never occurred."

If a defendant has not performed satisfactorily during the period of deferred entry of judgment, "the court shall render a finding of guilt to the charge or charges pled, enter judgment, and schedule a sentencing hearing as otherwise provided in this code." (§ 1000.3.)

(*McIntosh* v. *Municipal Court* (1981) 124 Cal.App.3d 1083, 1085 [177 Cal.Rptr. 683].)' (*People* v. *Barbarick* [(1985)] 168 Cal.App.3d [731,] 735 [214 Cal.Rptr. 322]; see also *Van Atta* v. *Scott*[, *supra*,] 27 Cal.3d 424, 438 . . . .)" (*In re York, supra,* 9 Cal.4th 1133, 1142-1143, fn. omitted.) Section 1318 "specifically authorizes the imposition of 'all reasonable conditions' in connection with an OR release." (*In re York, supra,* at p. 1146.) Nothing contained within the legislative history underlying the enactment of section 1318, precludes a court or magistrate from deciding on the amount of bail or imposing conditions upon OR release that are " 'reasonable' under the situation presented," even if those conditions are not specified in the statute and implicate a defendant's constitutional rights. (*In re York, supra,* at pp. 1146-1147.)

▪ Diversion, however, is entirely of statutory origin. (*People* v. *Cisneros, supra,* 84 Cal.App.4th 352, 357; see also *People* v. *Barrajas* (1998) 62 Cal.App.4th 926, 930 [73 Cal.Rptr.2d 123]; *Frederick* v. *Justice Court, supra,* 47 Cal.App.3d 687, 690.) "[T]he deferred entry of judgment statutes (§ 1000 et seq.) are special proceedings, statutorily limited . . . ." (*In re Scoggins, supra,* 94 Cal.App.4th 650, 658, fn. omitted.) "[D]iversion and deferred entry of judgment under section 1000 are similar in effect and purpose to probation," not release pending trial. (*People* v. *Perez* (1998) 68 Cal.App.4th 346, 355 [80 Cal.Rptr.2d 188]; see also *People* v. *Mazurette* (2001) 24 Cal.4th 789, 793-796 [102 Cal.Rptr.2d 555, 14 P.3d 227].) Section 1000 "prescribes a number of terms and conditions" related to successful completion of drug treatment that may be imposed upon the defendant, but no "additional conditions" are authorized by the statute to insure subsequent court appearances. (*Terry* v. *Superior Court, supra,* 73 Cal.App.4th 661, 665, 666.) "A court may not impose conditions beyond those specified in the statute, absent a compelling necessity. [Citation.] As remedial legislation, the deferral program must also be liberally construed to promote its objectives of rehabilitating novice drug users and of reducing congestion in the criminal justice system. (*Parra* v. *Municipal Court* (1978) 83 Cal.App.3d 690, 694 [148 Cal.Rptr. 203].)" (*People* v. *Cisneros, supra,* at p. 357.)

▪ We acknowledge that section 12022.1 enhancements may be imposed for release from custody which is the "functional equivalent of O.R. release in an adult proceeding," such as the pretrial " 'house arrest' release" of a juvenile or the "general release" of a minor pending trial, despite the statutory use of the adult terms "conviction, sentencing, and prison." (See *In re Jovan B., supra,* 6 Cal.4th 801, 814-815; *In re Rottanak K., supra,* 37 Cal.App.4th 260, 274, 279-282.) General release of a juvenile or conditional home supervision creates a "special custodial status" within the purview of section 12022.1. (*In re Jovan B., supra,* at pp. 814-815; *In re Rottanak K.,*

*supra,* at p. 280.) Diversion, however, does not constitute a special custodial status or other form of release of the defendant with a promise to appear at further proceedings, but rather a guilty plea and resolution of the case in the nature of " 'a specialized form of probation . . .' " for a particular class of defendants. (*People v. Cisneros, supra,* 84 Cal.App.4th 352, 358, citation omitted; *People v. Dyas* (1979) 100 Cal.App.3d 464, 469 [161 Cal.Rptr. 39]; *Frederick v. Justice Court, supra,* 47 Cal.App.3d 687, 691.)[11] We therefore conclude that for purposes of section 12022.1, an order of diversion under the deferred judgment statutes is neither a "release" on bail or OR nor the functional equivalent of it, and the enhancement findings are not supported by the evidence.

## DISPOSITION

Accordingly, we reverse the findings on the two section 12022.1 enhancements, and remand the case to the trial court for resentencing.[12] In all other respects the judgment is affirmed.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied February 19, 2003.

---

[11]Pursuant to section 1000.3, judgment is not final until the defendant successfully completes the assigned program and the criminal charge or charges are dismissed, or fails to "perform[] satisfactorily" in the assigned program, "is not benefiting from education, treatment, or rehabilitation," or engages in additional criminal behavior, whereupon the court renders a finding of guilt to the charge or charges pled, enters judgment, and schedules a sentencing hearing. (See *People v. Mazurette, supra,* 24 Cal.4th 789, 794.)

[12]In light of our reversal of the on-bail enhancements, we need not address the remaining claim presented by appellant that the second enhancement should have been stricken rather than stayed. Of course, we do not place any constraints upon the trial court's exercise of discretion in resentencing appellant, except those we have articulated in the opinion. We only direct the trial court to respondent's concession that presentence credits were miscalculated, and instruct the court to correct the number of credits when appellant is resentenced.